**CITY OF SAN ANTONIO,**
Texas, Appellant

v.

**SAN ANTONIO FIREFIGHTERS'**
**ASSOCIATION, LOCAL 624,**
Appellee

No. 04–15–00819–CV

Court of Appeals of Texas,
San Antonio.

Delivered and Filed: August 23, 2017

Dan Pozza, Law Offices Of Dan Pozza,
239 E Commerce St., San Antonio, TX

78205–2923, Lorien Whyte, Pozza & Whyte, PLLC, 239 E. Commerce, San Antonio, TX 78205, Martha Guadiana Sepeda, City of San Antonio, 100 S Flores 3rd Floor, San Antonio, TX 78283–3966, Deborah Lynne Klein, City of San Antonio, City Hall–3rd Floor, San Antonio, TX 78283–3966, Kenneth L. Clark, City of San Antonio, City Hall, 100 Military Plaza, Third Floor, San Antonio, TX 78283, Elizabeth Provencio, City of San Antonio, 100 W. Houston, 18th Floor, San Antonio, TX 78205, Michael D. Bernard, Bracewell & Giuliani, 300 Convent Street, San Antonio, TX 78205–3723, Andrew Segovia, 100 Military Plaza, San Antonio, TX 78283–3966, Jeffrey C. Londa, Ogletree Deakins Et Al, 500 Dallas St Ste 3000, Houston, TX 77002–4802, Bettye Lynn, Lynn, Ross Gannaway & Cranford, LLP, 306 W Broadway Ave Ste 100, Fort Worth, TX 76104–1204, for Appellant.

Ricky James Poole, Law Offices of Ricky J. Poole, 8000 Ih 10 W Ste 600, San Antonio, TX 78230–3887, for Appellee.

Sitting: Sandee Bryan Marion, Chief Justice Rebeca C. Martinez, Justice Luz Elena D. Chapa, Justice

## OPINION

Opinion by: Luz Elena D. Chapa, Justice

In this permissive appeal, the City of San Antonio asks us to review the denial of its motion for summary judgment. The City sought a declaration that the "evergreen clause" in the City's collective bargaining agreement (CBA) with the International Association of Fire Fighters Local 624 violates the debt limitations in the Texas Constitution and Texas public poli-

cy, rendering the entire agreement void or terminable at will.

We hold the City failed to establish as a matter of law that the evergreen clause or the CBA as a whole is void or violates public policy. We conclude the evergreen clause merely extends the duration of the CBA, but standing alone does not create a "debt." The CBA as a whole is not unconstitutional on the ground asserted by the City because it contains significant provisions that, even as extended by the evergreen clause, do not create unconstitutional "debt." Moreover, the CBA includes a savings clause that states "no portion of [the CBA] or provision [t]herein shall become inoperative or fail by reason of the invalidity of any other portion or provision." We also hold the CBA does not cede or improperly restrict the City's governmental or legislative powers and does not violate public policy. To the contrary, the CBA is consistent with public policy as expressed in Chapter 174 of the Texas Local Government Code, which authorizes collective bargaining between cities and fire fighters regarding compensation and conditions of employment and provides such agreements are "binding and enforceable against a public employer." We therefore hold the trial court did not err in denying the City's motion for summary judgment.

### BACKGROUND

The City of San Antonio has adopted Chapter 174 of the Local Government Code, The Fire and Police Employee Relations Act. Pursuant to Chapter 174, the International Association of Fire Fighters, Local 624 (the "Union") [2] is the recognized and exclusive bargaining agent for all full-time permanent civil service employees of

---

**2.** The Union is incorrectly named in the suit and in the style of this case as San Antonio

Firefighters' Association, Local 624.

the San Antonio Fire Department, with the exception of the Fire Chief. Multi-year collective bargaining agreements between the City and the Union have governed the terms and conditions of employment of Fire Department personnel for many years.

The parties are currently operating under a collective bargaining agreement ("CBA"), which on its face covers the period from October 1, 2009, through September 30, 2014, but which did not become effective until June 27, 2011, when it was signed after being approved by the City council. While the parties negotiated the current CBA and sought Union and City approval, they continued to operate under the 2005–2009 CBA pursuant to an "evergreen clause," which provided the contract would continue in effect until a specified future date unless first replaced by a successor agreement or terminated by mutual agreement. The current CBA also contains a negotiated evergreen clause. The duration provision of the CBA, article 38, section 1, provides:

Except as specifically provided herein, this Agreement shall be effective upon approval and signing by both parties. It shall remain in full force and effect until the 30th day of September, 2014 and shall continue in effect from year to year until replaced by a successor agreement or until terminated by mutual agreement. In no event shall this Agreement continue in effect after September 30, 2024.

The parties have not negotiated a successor agreement and have not agreed to terminate the 2009 CBA. Therefore, it remains in effect by application of the evergreen clause.

The CBA states it is intended to "achieve and maintain harmonious relations between the parties" by establishing the terms and conditions of employment and providing for the equitable and orderly adjustment of grievances. It is seventy-five pages long, contains thirty-eight articles, and covers a vast array of topics. Among its provisions, the agreement delineates the rights and obligations of management and of the Union. It sets out wage and overtime rates and step schedules for the fire fighter ranks and provides for wage increases through October 1, 2013.[3] The agreement specifies work schedules and how various types of leave are accrued and may be used. It provides a uniform allowance for each covered employee, requires the City to contribute specified amounts per employee to an optical/dental plan and a prepaid legal plan, and provides for incentive pay. The CBA requires the City to provide specified health benefits to fire fighters and their eligible dependents. Under the health benefits plan, the City is self-insured and pays benefits directly to providers. The fire fighters pay deductibles and co-payments, but no premiums. In addition, the CBA contains detailed procedures for drug and alcohol testing, promotions, and resolution of grievances. Finally, the CBA contains a savings clause stating the parties' intent that "no portion of [the] Agreement or provision [t]herein shall become inoperative or fail by reason of the invalidity of any other portion or provision."

In November 2014, the City filed its original petition, seeking a declaratory judgment that the evergreen clause is void because it violates the debt limitations in sections 5 and 7 of article XI of the Texas Constitution or, alternatively, the CBA violates public policy and is terminable at will. The petition alleges that the evergreen clause binds it to paying for a generous package of wages and benefits through

---

**3.** The fire fighters' contracted wages are frozen while the contract is in evergreen.

September 2024, that the cost of the benefits, most notably the health care benefits, continues to rise, and that the escalating costs are restricting the City's ability to provide other services. The Union answered, pleading various affirmative defenses, and counterclaimed, asserting the City was acting in bad faith.

The City filed a motion for partial summary judgment, seeking judgment as a matter of law on its claims. The motion asserted that the multi-year obligations imposed on it by the CBA constitute debt not payable until future years and for which no means of payment was established when the contract was signed. The City contended this violates the debt limitations of the Texas Constitution. The motion sought declarations "that the 10–year Evergreen clause is void under Article 11, §§ 5 and 7 of the Texas Constitution" and "as a matter of public policy, that the 10–year Evergreen clause makes the CBA terminable at will by the City."

The trial court denied the motion for summary judgment, ruling that "the Evergreen Clause in the CBA is not void or illegal because (1) it does not violate Article 11, Sections 5 and 7 of the Texas Constitution, and (2) it is not contrary to public policy." The trial court found there is substantial ground for differences of opinion as to the following controlling question of law:

> Whether the 10–year Evergreen clause is void under Article 11, §§ 5 and 7 of the Texas Constitution or whether, as a matter of public policy, the 10–year Evergreen clause makes the Collective Bargaining Agreement (CBA) terminable at will by either party with reasonable notice.

The trial court found that an immediate appeal of the order denying the motion for summary judgment would materially advance the ultimate termination of the litigation, and granted permission to appeal. This court granted the City's petition for permission to appeal the interlocutory order.

### STANDARD OF REVIEW

We review de novo the trial court's ruling on a motion for summary judgment. *Provident Life & Accident Ins. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). We take as true all evidence favorable to the respondent and indulge all reasonable inferences and resolve any doubts in the respondent's favor. *Id.* We determine whether the movant established its entitlement to summary judgment on the issues expressly presented to the trial court by conclusively proving all essential elements of its claims as a matter of law. *City of Hous. v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979). The arguments of the parties in this appeal require the court to review Texas constitutional and statutory provisions, as well as the parties' unambiguous contract. These are all matters of law, which we review de novo. *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009) (contract); *Harris Cty. Hosp. Dist. v. Tomball Reg'l Hosp.*, 283 S.W.3d 838, 842 (Tex. 2009) (constitution and statutes).

### CONSTITUTIONAL "DEBT" LIMITATIONS

Article XI, Section 5 of the Texas Constitution provides, in part that:

> [N]o debt shall ever be created by any city, unless at the same time provision be made to assess and collect annually a sufficient sum to pay the interest thereon and creating a sinking fund of at least two per cent.

TEX. CONST. art. XI, § 5. Section 7 provides in part:

> But no debt for any purpose shall ever be incurred in any manner by any city

or county unless provision is made, at the time of creating the same, for levying and collecting a sufficient tax to pay the interest thereon and provide at least two per cent (2%) as a sinking fund,
. . . .

*Id.* § 7. Both of these sections of the Texas Constitution apply to the City of San Antonio. *See City of Terrell v. Dissaint*, 71 Tex. 770, 9 S.W. 593, 593–94 (1888); *Noel v. City of San Antonio*, 11 Tex.Civ.App. 580, 33 S.W. 263, 264–65 (1895, writ ref'd). The purpose of these sections is to protect cities' financial standing and the interests of its other creditors. *See Dissaint*, 9 S.W. at 594. The drafters intended to require local governments to operate on a cash basis and to limit their ability to pledge future revenues for current debts. *See T. & N. O. R.R. Co. v. Galveston Cty.*, 141 Tex. 34, 169 S.W.2d 713, 715 (1943); *Mun. Admin. Servs., Inc. v. City of Beaumont*, 969 S.W.2d 31, 38–39 (Tex. App.—Texarkana 1998, no pet.).

To decide the issue before us, we must examine what is meant by "debt," as used in the constitutional provisions. The principal case construing them is *McNeill v. City of Waco*, 89 Tex. 83, 33 S.W. 322 (1895). The court stated the purpose of the constitutional provisions was to restrain the power of cities to contract a pecuniary liability that would not be satisfied out of either the current revenues of the city or out of other funds within the city's control and lawfully applicable to the liability. *Id.* at 323–24. Such unfunded or "unprovided-for liability" is a "debt" within the meaning of the constitutional provisions. *Id.* at 323. Any "attempted 'creation' or 'incurring' of a 'debt,' for any conceivable purpose, and in any conceivable manner, without making the 'provision,' is contrary to the express prohibition of the constitution, and void." *Id.* The court recognized the word "debt" has different meanings in different con-

texts and defined "debt" as used in the constitutional provisions to mean:

any pecuniary obligation imposed by contract, except such as were, at the date of the contract, within the lawful and reasonable contemplation of the parties, to be satisfied out of the current revenues for the year, or out of some fund then within the immediate control of the corporation.

*Id.* at 324.

■ "[P]ecuniary obligations in good faith intended to be, and lawfully, payable out of either the current revenues for the year of the contract or any other fund within the immediate control of the [city]" are not "debts." *Id.* at 323–24. Thus, when the subject of the contract is "a matter of ordinary expenditure, such as repairing streets or salary of an officer, ..., the prima facie presumption would be that such claim was intended to be paid out of the current revenues annually collected for payment of such claims, and it would not be presumed the city had attempted to make contracts in excess of its revenues for the year." *Id.* at 324. However, a contract to pay current expenses, even "ordinary" ones, in future years without making provision for payment at the time of contracting is unconstitutional. *Dissaint*, 9 S.W. at 594.

■ *McNeill* has been applied in various contexts, generally in contracts for goods or services. When a city has contracted to pay a sum of money over a period of more than one year and the evidence shows the city did not contemplate paying the whole cost of the contract out of current revenues in the year of the contract or out of a fund established specifically to pay for that contract, then the contract creates a "debt" and is unconstitutional and void unless a tax was levied and a sinking fund established. *See, e.g., Stevenson v. Blake*, 131 Tex. 103, 113

S.W.2d 525, 526–28 (1938) (holding contract to pay attorneys $3,000 in installments over period of several years for work to be performed over same period created unconstitutional obligation because parties did not contemplate entire amount due would be satisfied out of revenues of year contract was signed and no sinking fund was established); *see also B.L. Nelson & Assocs., Inc. v. City of Argyle*, 535 S.W.2d 906, 910 (Tex. Civ. App.—Fort Worth 1976, writ ref'd n.r.e.). Such a contract can avoid constitutional infirmity and is considered a commitment of current revenues if it is conditioned on yearly appropriation of funds or contains a provision that allows the city to terminate it at the end of each budget period. *See* TEX. LOC. GOV'T CODE ANN. § .271.903 (West 2016) (applicable to city contracts for lease or purchase of real or personal property); *City of Bonham v. Sw. Sanitation, Inc.*, 871 S.W.2d 765, 768 (Tex. App.—Texarkana 1994, writ denied); *City–County Solid Waste Control Bd. v. Capital City Leasing, Inc.*, 813 S.W.2d 705, 707 (Tex. App.—Austin 1991, writ denied). The CBA does not contain such a provision.

■ Contracts creating contingent future liabilities may also create unconstitutional "debt." The case of *T. & N. O. R.R. Co. v. Galveston County* concerned a 1908 contract among Galveston County and multiple companies to construct a causeway and a drawbridge, and to maintain, operate, and repair the drawbridge for 999 years. 169 S.W.2d at 714. One provision of the contract required the county to indemnify the other parties to the contract from certain claims arising from the use of the drawbridge. *Id.* The assignee of one of the parties to the contract sought indemnity against the county after it settled two death claims. The county defended on the ground the indemnity clause violated article XI, section 7 of the constitution. The

court agreed and held the indemnity clause in the contract created a pecuniary obligation the parties did not reasonably contemplate would be paid out of funds available to the county in 1908. *Id.* at 715–16. It was therefore a debt and the county should have created a sinking fund when the contract was made to provide for the debt. *Id.* Because the county did not do so, the indemnity clause was held void. *Id.* at 716.

■ Cases after *McNeill* have also clarified when multi-year contractual obligations of a city are not considered "debt" within the meaning of article XI sections 5 and 7. Multi-year contracts that set prices and rates for goods or services to be provided in the future do not create a "debt" when under the contract either the city retains control over the amount to be purchased or the city's obligation to pay arises only upon use of the service or acquisition of the goods. Such contracts do not commit future revenues for current obligations. In *City of Tyler v. L.L. Jester & Co.*, 97 Tex. 344, 78 S.W. 1058 (1904), the Supreme Court held that a city's thirty-year agreement with a water company for water "to be delivered in the future did not create a debt against the city, but the liability of the city arose upon the use by it of the water during each year." *Id.* at 1062. The agreement provided the company would supply water to the city and its inhabitants and set the rate to be charged as a fixed rate per fire hydrant, the number of which would be designated by the city. The supreme court held the contract did not create an unconstitutional "debt." *Id.* at 1059, 1063; *see City of Cleburne v. Cleburne Water, Ice & Lighting Co.*, 14 Tex.Civ.App. 229, 37 S.W. 655, 655–57 (1896, writ ref'd) (finding five-year contract for water for fire protection did not bind city to take any specified number of hydrants and holding no debt was incurred until city designated

and accepted the number of hydrants desired for the year, at which time amount due became current expense of city payable out of current revenue). Similarly, in *Dallas Electric Co. v. City of Dallas*, 23 Tex.Civ.App. 323, 58 S.W. 153, 154 (Tex. Civ. App. 1900, writ ref'd), the city had a three-year contract to provide lighting at a fixed rate per light and to place additional lamps at such time and places as designated by the city council. A competing company challenged the validity of the contract, alleging it created an unconstitutional debt. *Id.* at 154–55. The court held the contract was not an attempt to create a debt that fell within the constitutional prohibition:

> The contract now under consideration being for rental of lights for the use of the city, and payment therefor to be made only upon the performance of the service provided for, and the annual rental thereof not exceeding the amount the city council was legally authorized to collect and appropriate for each year, it did not create such a debt as comes within the constitutional provision which inhibits the creation of a debt without at the same time making provision for its payment.

*Id.* at 155.

In two other cases, the Texas Supreme Court considered whether multi-year contracts violated Texas constitutional prohibitions on creating a debt on behalf of the state and on appropriations for a term longer than two years. *See* TEX. CONST. art. III § 49(a), art. VIII, § 6. The contract at issue in *Charles Scribner's Sons v. Marrs*, 114 Tex. 11, 262 S.W. 722 (1924), obligated a textbook publisher to furnish and sell and the State to purchase a specific textbook for use in the public schools for a period of five years. *Id.* at 723. The contract did not obligate the state to purchase a fixed number of books, but only so

many as were needed by the schools. *Id.* at 725. The court noted that there is no constitutional limit on the length of term for which a contract may be made by the state. *Id.* at 726. Then, citing *McNeill, City of Tyler, City of Cleburne,* and *Dallas Electric,* the court held that no "debt" was created because the contract did not obligate the state to pay any particular sum or to buy a fixed number of books:

> The obligation to pay arises only upon the purchase and delivery of books for the year when needed, and according to the purchase. The books so furnished and so purchased during any year do not make a charge on the future resources of the state, but are paid for each year as the purchases are made.

*Id.* at 725. More recently, in *City of Big Spring v. Board of Control,* 404 S.W.2d 810 (Tex. 1966), the Board of Control—a state agency—contracted to purchase water from the city for use at a hospital at the rate of 10 cents per 1,000 gallons for so long as the State in good faith maintained and operated the hospital. *Id.* at 811. The court held the contract did not create a "debt" that could not be paid using funds from the fiscal period in which the contract was entered. Rather, liability arose only upon use of the water by the hospital. *Id.* at 813–15.

### DISCUSSION—CONSTITUTIONALITY OF THE CBA

■ The issue decided by the trial court is "whether the 10–year Evergreen clause is void under Article XI, §§ 5 and 7 of the Texas Constitution." The City contends that because the evergreen clause is void, the CBA has expired and is of no effect. As with state contracts, there is no constitutional limit on the length of term for which a contract may be made by a city. *See Charles Scribner's Sons,* 262 S.W. at 724. A multi-year contract entered into by a city is not *ipso facto* unconstitutional. *See, e.g., City of Tyler,* 78 S.W. at 1059,

1063 (thirty-year franchise); *Dall. Elec. Co.*, 58 S.W. at 154–55 (three-year contract); *City of Cleburne*, 37 S.W. at 655–57 (five-year contract); *City of Mission v. BFI Waste Servs. of Tex., LP*, No. 7:12-CV-139, 2013 WL 12100805, at *1, 4–5 (S.D. Tex. July 19, 2013) (five-year contract with evergreen clause); *Carlisle v. Trudeau*, No: 4:04CV309, 2006 WL 722122, at *1–2 (E.D. Tex. March 14, 2006) (three-year employment contract). We conclude the evergreen clause is simply a duration term; it does not, in and of itself, create any debt. The evergreen clause alone therefore does not violate the debt limitations in the Texas Constitution.

The City further argues that the "plethora" of "all encompassing" obligations in the CBA makes the CBA a pecuniary contractual obligation. It argues the duration of contract, as extended by the evergreen clause, and the absence of language giving the City the right to terminate the agreement at will or making it contingent on yearly appropriations, result in an unfunded, unconstitutional debt. The argument is based on the City's premise that "[w]hen the CBA was created in 2011, an absolute debt was created at once with only the time of payment being postponed." The amount of the "debt" is presumably the total expense of complying with the contract, including the value of all the wages and benefits estimated to be due from 2011 through 2024. The City contends this debt is unconstitutional because (1) the entire debt was not payable out of the City's incoming revenues in 2011 or out of a fund within the City's control and specifically designated for that purpose in 2011, (2) the City did not levy a tax to cover interest on the debt and establish a sinking fund to pay the debt, and (3) the CBA was not made terminable at the will of the City at the end of each fiscal year nor made contingent on annual appropriations.

In making this argument, the City focuses on article 25 of the CBA, which requires the City to provide health care benefits, and several articles that set forth the agreed wage rates, allowances for items such as uniforms, and provisions that require the City to make per-employee contributions to various funds. The City argues its financial obligations under these provisions increase each year and the cost is beyond its control. In particular, the City points to article 25 of the CBA and its attached Master Contract document, which require the City to pay the usual and customary charges for a specified list of health care benefits for employees and their eligible dependents. The CBA provides the City may not reduce the benefits provided during the term of the contract, but it is not precluded from reducing the usual and customary charge for particular services if done in accordance with the Master Contract. The City asserts the cost of the health care benefits it is required to provide continues to increase and it has no ability to control the increasing cost. In this regard, the City argues its contractual obligation to provide health care benefits through 2024 at an unknown, increasing, and uncontrollable cost is akin to the indemnity agreement stricken in the *Galveston County* case.

The Union argues that no "debt" is created by the CBA because the CBA is not an attempt to fund current expenses out of future revenues. It contends that ordinary operating expenses such as employee wages and benefits are not "debts" within the meaning of the Texas Constitution because no amount will be owed for a future year's wages and benefits until work is performed by fire fighters and an obligation to pay them is incurred. According to the Union, the CBA sets a unit price for wages, reimbursement allowances, contribution rates, and the other benefits provided in the contract; it is not a contract of

employment. The City determines the cost of complying with the CBA each year when it exercises its right to determine the size of the workforce. The wages and benefits payable under the contract are contingent ordinary expenses of the City that the City becomes obligated to pay only upon the performance by the individual fire fighters employed by the City. The funds for these expenses are budgeted each year and paid out of the then-current revenues of the City. According to the Union, the CBA is analogous to the contracts in *City of Tyler, City of Cleburne, Dallas Electric,* and *Charles Scribner's Sons* because the City has the ability to control the cost of complying with the CBA in future years by virtue of its right to control the size of the workforce. It argues this distinguishes the CBA from the indemnity contract in *Galveston County,* where the amount and timing of the future contingent liability was wholly unknowable and uncontrollable by the county.

■ ▆▆ In construing the parties' contract, we are obliged to review and consider the entire writing and to attempt to harmonize and effectuate all provisions in accordance with the parties' intent as expressed in the contract. *FPL Energy, LLC v. TXU Portfolio Mgmt. Co.*, 426 S.W.3d 59, 63 (Tex. 2014). The CBA is a conglomeration of reciprocal promises relating to many different aspects of the employment relationship between the City and its professional fire fighters. The CBA states it was intended by the parties "to achieve and maintain harmonious relations between the parties, to establish benefits, compensation and other terms and conditions of employment and to provide for the equitable and orderly adjustment of grievances." Its scope therefore is necessarily broad and separate articles establish the parties' rights and responsibilities with respect to a wide range of issues, including management rights, union recognition and activity, lawsuit defense, prohibition of strikes and lockouts, wages, hours, leave, employment benefits, grievance procedures, promotion procedures, drug testing, health benefits, and more. The parties made their intent clear as to what should occur if any part of the agreement were held invalid:

> Should any provision of this Agreement be found to be inoperative, void or invalid by a court of competent jurisdiction, all other provisions of this Agreement shall remain in full force and effect for the duration of this Agreement, it being the intention of the parties that no portion of this Agreement or provision herein shall become inoperative or fail by reason of the invalidity of any other portion or provision.

To obtain the relief it seeks from this court—a declaration that the CBA, as extended by the evergreen clause, is void—the City was required to establish either that the entire CBA constitutes a debt or that non-severable obligations imposed by the CBA are unconstitutional debt, rendering the CBA void in its entirety. Conversely, if there are any severable provisions of the CBA that are not void for violating sections 5 and 7 of article XI of the Texas Constitution, the entire CBA is not void and the trial court properly denied the motion for summary judgment. To decide whether the City met its burden, we examine various provisions of the parties' contract.

### Wage rates, allowances, and per-employee contributions required by the CBA

Many of the pecuniary provisions in the CBA are agreements to pay wages or benefits at certain rates. The wages article sets wage rates and step schedules, specifying base monthly salaries based on classification and seniority. Another article

requires the City to provide a specified uniform credit and clothing allowance per employee per year. The CBA also requires the City to make a specific monthly contribution per employee into an optical/dental plan and a prepaid legal plan and to provide a parking space for each employee assigned to four specified locations.

The actual amount the City will owe in a given year for these operating expenses depends primarily on the number and classification of employees in the Fire Department. The contract does not expressly obligate the City to pay millions of dollars in wages and benefits and does not contain any minimum staffing or funding requirements. These provisions of the CBA set wage rates, allowances, and per-employee contributions. The Union contends the City retains control of these expenses because the City prescribes by ordinance the number of positions in each classification, and it budgets the wages and benefits to be paid each year out of current revenues, based upon the size of the workforce.[4] The City disagrees with the Union's assertion that the City retains the right to control the size of the Fire Department's workforce, contending the CBA has stripped the City of any such power.

 The City is governed by the Firefighter and Police Civil Service Act, Chapter 143 of the Local Government Code, and Chapter 143 provides the backdrop for collective bargaining. *See City of San Antonio v. Bullock*, 34 S.W.3d 650, 653 (Tex. App.—San Antonio 2000, pet. denied). Chapter 143 prevails over a collective bargaining contract unless the collec-

tive bargaining contract specifically provides otherwise. TEX. LOC. GOV'T CODE ANN. § 174.006(a) (West 2016); *see City of San Antonio v. Scott*, 16 S.W.3d 372, 375 (Tex. App.—San Antonio 1999, pet. denied). Likewise, every collective bargaining agreement between the City and the Union since 1975 has contained a provision similar to article 37, section 2 of the current CBA, which states:

> Additionally, in the event that any provisions of this Agreement conflicts or is inconsistent with any provision of Chapter 143 Local Government Code, this Agreement shall prevail, notwithstanding any such provision of the Civil Service Statutes.

Therefore, if the City and the Union want to deviate from any of the provisions or requirements of Chapter 143, they must specifically do so in their agreement. If the agreement is silent on a particular matter, the provisions of Chapter 143 apply and control. *See Bullock* 34 S.W.3d at 655; *Scott*, 16 S.W.3d at 376. A provision of Chapter 143 will be deemed inapplicable only if the parties addressed the issue in their collective bargaining agreement and the agreement provision "specifically conflicts with" Chapter 143. *Bullock*, 34 S.W.3d at 655.

 Chapter 143 vests the municipality's governing body with the authority to establish the number of classified positions, and requires the governing body to prescribe the number of positions in each fire fighter classification by ordinance. TEX. LOC. GOV'T CODE ANN. § 143.021(a) (West 2008); *see Thompson v. City of Waco*, 438 S.W.3d 760, 763 (Tex. App.—

---

4. This distinguishes these wage and benefit provisions of the CBA from the agreement to provide health care benefits, for which the City does not pay a set amount per employee, but rather pays the "usual and customary" amount for the services employees and their dependents receive during the year. Although the City can estimate future expenses based on past experience, it has no control over the level of benefits that will be used and contends it also cannot control the increasing rise in the "usual and customary" cost of services.

San Antonio 2014, pet. denied) (stating "the Act allows only the city council . . . to change the number of classified positions"); *Bullock*, 34 S.W.3d at 653 (stating the "Civil Service Act . . . grant[s] the San Antonio City Council the power to regulate the classifications and numbers of firefighters in each class"). "[T]he total responsibility for creating and abolishing civil service positions in the Fire Department rests in the City Council; and a position so created in a duly enacted ordinance by the City Council is vacant so long as it is not filled, and until abolished by action of the Council." *Duckett v. City of Hous.*, 495 S.W.2d 883, 886 (Tex. 1973). Because of the public policy of protecting civil service workers, a city's right to abolish civil service positions has been held to incorporate a requirement that the city act in good faith. *City of San Antonio v. Wallace*, 161 Tex. 41, 338 S.W.2d 153, 156–57 (1960); *see City of San Antonio v. Kneupper*, 161 Tex. 153, 338 S.W.2d 121, 121–22 (1960) (holding record failed to show that abolishing position and transfer of duties to independent contractor would accomplish either a substantially improved municipal service or a real economy in governmental operations). Section 143.085 outlines the procedures to be followed when positions are abolished or there is a reduction in force. TEX. LOC. GOV'T CODE ANN. § 143.085; *Thompson*, 438 S.W.3d at 763–65; *Bullock*, 34 S.W.3d at 658–59; *City of Fort Worth v. Nyborg*, 999 S.W.2d 451, 456 (Tex. App.— Fort Worth 1999, pet. denied).

 The City argues that its right under Chapter 143 to reduce the number of classified positions has been taken away or restricted by article 3, sections 1E and 1G of the CBA. Those sections state:

> The Union recognizes the management of the City of San Antonio and the direction of the Fire Department are vested exclusively in the City, subject to the terms of this Agreement, and nothing in this Agreement is intended to circumscribe or modify the existing rights of the City. These rights include:
>
> . . .
>
> E. Relieve employees from duties due to lack of work, subject to Civil Service regulations and/or the terms of this Agreement
>
> . . .
>
> G. Use civilians in the Fire Department to perform duties which do not require a sworn certified Fire Fighter. In this regard, the City is authorized to civilianize the following positions or units: [list of positions follows]

In addition, section 2 of article 3 states:

> THE UNION UNDERSTANDS AND AGREES THAT: Section 2.
>
> . . .
>
> C. Except as otherwise specifically provided in this Agreement, the City, acting through the City Manager and the Fire Chief, shall retain all rights and authority to which by law it is their responsibility to enforce.

The City argues article 3, section 1E specifically prohibits the City from decreasing the number of fire fighters on the payroll or to lay off fire fighters for any reason other than "lack of work." We disagree. Article 1, section 3 of the CBA does nothing more than "recognize" a *nonexclusive* list of rights the City and the Fire Chief have under State law, independent of the CBA. Nothing in article 3 or anywhere else in the CBA restricts the City and the Fire Chief to exercising only those management rights listed in article 3, section 1 or prohibits the City from exercising rights not listed in section 1 that do not otherwise conflict with the CBA. There are no provisions in the CBA that purport to modify or conflict with the City's authority under section 143.021(a) to prescribe by

ordinance the number of positions in each classification. Nor is there any provision in the CBA that modifies or conflicts with the procedures in section 143.085 for effecting a reduction in force. Thus, although the CBA "recognizes" the City's authority to reduce the workforce for "lack of work," it does not prohibit the City from reducing the workforce for other reasons.

We also disagree with the City's assertion that section 1G "limits" civilianization to the listed tasks. Rather, section 1G is a concession by the Union that the City may civilianize certain positions in the Fire Department. But the section does not restrict the City's ability to civilianize other positions that do not require a sworn certified fire fighter if it can do so in good faith and in accordance with Chapter 143.

We conclude the City has the right and exclusive authority to control the size of the workforce pursuant to Chapter 143 and the case law construing it, and that nothing in the CBA conflicts with or restricts that authority. Because these provisions of the CBA simply set wage rates, allowances, and per-employee contribution amounts and the City retains control over the size of the workforce, these provisions did not create a debt against the City. Rather, the City's liability for these wages and these benefits arises only upon actual work being performed. Through its budgeting process and through ordinances setting the number of positions in each classification, the City determines the services needed for the year, to be paid for with then-current revenues. These wage rate, allowances, and per-employee contribution provisions in the CBA therefore do not constitute "debt" prohibited by article XI, sections 5 and 7 of the Texas Constitution. *See City of Tyler*, 78 S.W. at 1063; *Dall. Elec. Co.*, 58 S.W. at 154–55; *City of Cleburne*, 37 S.W. at 655–57; *see also City of*

*Big Spring*, 404 S.W.2d at 813–15; *Charles Scribner's Sons*, 262 S.W. at 724–25.

### Non-pecuniary obligations in the CBA

The CBA also contains extensive provisions that are not facially pecuniary obligations. It contains a detailed grievance procedure that is intended to provide a just and expeditious method for resolving disputes concerning all aspects of the employment relationship. The article on promotions specifies how eligibility for promotion is determined and the procedures for conducting promotional examinations. The article on drugs and alcohol sets out requirements for random testing, reasonable suspicion testing, and post-accident testing; states the parties' agreements regarding drugs to be screened and threshold levels; and provides for discipline as well as for incentives to seek treatment. In addition, there are articles prohibiting strikes and lockouts, regulating Union activity on city time, and prohibiting discrimination by both the City and the Union. The City asserts that these provisions cost the City an unascertainable amount of money (e.g., the cost of deducting union dues (paid by the employee) from payroll) and should be considered pecuniary obligations, which, if not provided for, are unconstitutional "debt." The City has provided no argument or authority for the contention that the incidental expenses associated with complying with these articles in the CBA create or constitute a "debt" within the meaning of the constitution. Likewise, the City provides no argument or authority that extending the duration of non-pecuniary contractual obligations by means of the evergreen clause is unconstitutional. We hold these non-pecuniary obligations in the CBA, as extended by the evergreen clause, do not violate the debt limitations of the Texas Constitution.

### Health care benefits and severability

The City's arguments focus on the contractual obligation to provide health care benefits and its assertion that this obligation is an unconstitutional debt. However, the City did not move for summary judgment on this narrow issue—whether article 25, providing health care benefits, as extended by the evergreen clause, is unconstitutional. It sought only a declaration that the entire CBA is void because of its duration and the failure to include language that gives the City the right to terminate the agreement at the end of each year or to make the agreement contingent on yearly appropriations. To be entitled to a declaration that the entire CBA is void, the City would need to establish both that article 25 creates an unconstitutional "debt" and that article 25 is so integral to the agreement that it could not be severed.

Where an invalid provision in a contract is "only a part of the many reciprocal promises in the agreement" and does not constitute "the main or essential purpose of the agreement," it may be severed and the invalidity does not cause the entire contract to fail. *In re Poly–America, L.P.*, 262 S.W.3d 337, 360 (Tex. 2008) (orig. proceeding) (quoting *Williams v. Williams*, 569 S.W.2d 867, 871 (Tex. 1978)). "Whether or not the invalidity of a particular provision affects the rest of the contract depends upon whether the remaining provisions are independent or mutually dependent promises, which courts determine by looking to the language of the contract itself." *Id.*

The purpose of the CBA is to establish the "terms and conditions of employment and provid[e] for the equitable and orderly adjustment of grievances" in order to "achieve and maintain harmonious relations between the parties." Health care benefits are certainly an important element of the terms of employment, but cannot be said to be paramount to the provisions for wage rates, leave, vacations, grievances, promotions, and the like. Nothing in the CBA suggests the article on health care benefits constitutes the "main" or "essential purpose" of the agreement. To the contrary, in the savings clause, the parties clearly expressed their intent that each of the matters addressed in the agreement be considered independent promises. *See id.* (considering the savings clause in contract in determining parties' intent to excise invalid provisions). Accordingly, if article 25 were found to impose an unconstitutional debt, it would be severable from the remainder of the contract and the rest of the CBA would "remain in full force and effect for the duration of [the] Agreement." We therefore do not reach the question of whether article 25, providing for health care benefits, creates an unconstitutional debt because a holding that it does would not entitle the City to a declaration that the entire CBA is void.

### Constitutionality—Conclusion

The evergreen clause, in and of itself, creates no debt and does not violate article XI, sections 5 and 7 of the Texas Constitution. The constitutional limitations on contracting in article XI sections 5 and 7 apply only to "debt" assumed or incurred by the City, not to all contractual obligations. For the reasons discussed above, significant provisions of the CBA, as extended by the evergreen clause, involve rights and obligations that do not create unconstitutional debt. The City thus did not establish as a matter of law that the entire CBA constitutes a "debt" for which "provision" must have been made. The City also did not establish as a matter of law that any particular provision of the CBA creates unconstitutional debt *and* is so integral to the entire contract that it

could not be severed if held invalid. Accordingly, because neither the evergreen clause nor the CBA as a whole is unconstitutional, the trial court did not err in denying the motion for summary judgment seeking to declare the CBA void on that ground.

## THE CBA AND PUBLIC POLICY

 In its second ground for summary judgment, the City argues the CBA violates public policy because it restricts or impairs the free exercise of the City's governmental powers. Under the reserved powers doctrine, certain legislative and governmental powers "are conferred on government entities for public purposes, and can neither be delegated nor bartered away. Government entities cannot cede away such powers through contracts with others so as to disable them from the performance of their public duties." *Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.*, 320 S.W.3d 829, 843 (Tex. 2010) (internal quotation marks and citations omitted). A city contract that does so is not binding and is terminable at will. *See id.* at 842; *Clear Lake City Water Auth. v. Clear Lake Utils. Co.*, 549 S.W.2d 385, 391 (Tex. 1977).

 The City argues the CBA "restricts" the "free exercise of the City's governmental powers" because it obligates the City to spend such a significant amount of its revenues to comply with the CBA that it interferes with the City's right to exercise its legislative power to determine how to spend its money and commit its resources in the best interest of the citizens. The City contends the contract violates public policy and is void unless it is made terminable at will. The City's argument is based on summary judgment evidence that the City's "public safety" budget constitutes 66% of the City's General Fund budget and assertions that the public safety budget is increasing, primarily because of the cost of health care. The City also relies on its allegation that it is without the power to control its spending on fire fighters for the duration of the extended CBA.

The principal case on which the City relies is *Clear Lake City Water Authority v. Clear Lake Utilities Co.* This was a suit to determine the validity of a contract of indefinite duration between the Authority and Utilities, a private utility company. *Clear Lake City Water Auth.*, 549 S.W.2d at 387–88. The agreement provided Utilities would construct and maintain a water and sewer pipeline system to serve a 100–acre tract and the Authority agreed to meet all the water and sewage needs of Utilities. *Id.* In addition, Utilities was granted the exclusive right to furnish water and sewer service to the landowners in the 100–acre tract under terms and rates that Utilities negotiated with the owners. *Id.*

The supreme court first noted that under Texas law generally, it will be implied that a contract of indefinite duration was intended to bind the parties for a reasonable time. *Id.* at 390–91. However, that rule would not be applied in the case because public policy required the contract be terminable at will. The court found that, by statute, the governmental functions of the Authority included the power to operate water and sewer systems and to sell water and other services and to set the rates therefor. *Id.* at 391. By ceding to Utilities the exclusive right to provide services to the landowners in the 100–acre tract at rates set by Utilities, the Authority restricted the free exercise of its governmental powers. *Id.* at 391–92. The court held that unless the contract were treated as terminable at will, it would be void *ab initio*. *Id.* at 391, 392; *see generally Bowers v. City of Taylor*, 16 S.W.2d 520 (Tex.

1929) (holding city agreement with railroad company to close public road for the exclusive use of the railroad for a period of fifteen years impermissibly disabled city from exercising its governmental power to open, extend, or widen any street when public convenience requires it); *City of Brenham v. Brenham Water Co.*, 67 Tex. 542, 4 S.W. 143 (1887) (holding city's contract granting private company exclusive right to provide water to city for twenty-five years for a fixed payment per year and obligating city to pay for fixed number of hydrants, whether water was used or not, impermissibly withdrew from the city its right to provide water to its inhabitants in some other authorized way and created an unconstitutional monopoly).

In contrast, the City did not cede, delegate, or abdicate any of its governmental or legislative powers to the Union or to any other party in the CBA. The CBA is a contract governing the terms and conditions of employment. It does not restrict the City in the performance of any of its governmental functions or bargain away any of its governmental powers. With respect to the City's governmental function of providing fire protection, article 3 section 1 expressly recognizes the City's and Fire Chief's rights to "direct the work of [Department] employees," "[u]tilize the Fire Department in emergency situations to protect life and property," and "[d]etermine the methods, processes, means, and personnel by which operations are to be carried out." And it states that nothing in the CBA is intended to circumscribe those rights.

The City contends this understanding of *Clear Lake* and *City of Brenham* is too narrow. The City essentially contends that a city contract cannot be made binding for a period longer than one funding cycle or the term of office of the council members. It argues that any such contract must be

terminable at will or the contract would impermissibly restrict the City's governmental or legislative powers by restricting future city councils' ability to set and fund their own policies.

Although the *City of Brenham* opinion, written in 1887, has some broad language that appears to support the City's argument, that language was not the basis of the decision in that case. *See* 4 S.W. at 152–53. Further, the supreme court did not rely on that reasoning in *Clear Lake* and it rejected arguments similar to the City's in *City of Big Spring* and in *Charles Scribner's Sons*. In *City of Big Spring*, the city argued its 1937 contract was invalid. The contract required the city to furnish water to the Big Spring State Hospital at 10 cents per 1,000 gallons in a quantity not to exceed 300,000 gallons per day as long as the State in good faith maintained and operated the hospital on the site. 404 S.W.2d at 811–13. The city contended the contract, which had been in effect more than twenty years, was of indefinite duration and impermissibly restricted the city's legislative power to control its revenues and set its water rates. *Id.* at 815. The supreme court held that the city had statutory authority to enter into a contract to furnish water and to set the rate and term, the contract was not of unlimited duration, and it was valid and binding on the City. *Id.* at 812–13, 815–16.

In *Charles Scribner's Sons*, the supreme court rejected an argument that public policy prohibited the State from entering into a textbook contract for a period longer than the official term of office:

The fact that the official term of office is commonly two years, together with the limitation that appropriation shall not be made for a longer term than two years, is argued as indicating a general public policy, and that in keeping with same

this limitation of two years should be implied on the term of contracts.

Those provisions of government do fix the public policy with regard to them, but it cannot be held that the limitation that no appropriation of money shall be made for a longer term than two years is by implication a limitation upon a contract that does not require an appropriation to be made for a longer term than two years.

Both subjects, appropriations and contracts, are of such importance, and each so common and so essential to the administration of the government, that it is reasonable to presume that if it had been the purpose of the makers of the Constitution to prohibit the making of contracts that would extend over a period of more than two years, they would have made that purpose plain by direct reference to that important subject.

The Legislature has placed no limitation upon the contractual power in reference to the contracts for the purchase of textbooks, except that no contract shall be made for a longer term than six years. The Constitution and the Legislature having thus made or fixed the public policy of the state in regard to such contracts, it is not the province of the courts by implication or otherwise to alter or modify that public policy or to announce a different policy.

262 S.W. at 726.

The City has not provided any authority that directly limits the allowable length of a city's collective bargaining agreement with public safety unions. The public policy of this State, as expressed by the legislature, is that fire fighters and police officers have the right to organize and to collectively bargain with their political subdivision employers regarding their compensation and conditions of employment. TEX. LOC. GOV'T CODE ANN. § 174.002(b). On adoption of Chapter 174, fire fighters are entitled to organize and collectively bargain with their public employer regarding compensation, hours, and other conditions of employment. *Id.* § 174.023. And an agreement reached through such collective bargaining is "*binding and enforceable against a public employer.*" *Id.* § 174.109 (emphasis added). The public policy in this regard is expressed in Chapter 174, and it does not provide that such agreements are binding only if for a period of one year or less, as the City would have us hold.

Finally, we note that the summary judgment evidence did not establish what it costs the City to comply with the CBA or that its cost has hindered the City's ability to exercise its legislative and governmental powers. The assistant city manager who oversees the budget testified by deposition that the "public safety" budget that comprises 66% of the City's general fund includes "all expenses related to provide public safety services to the community." It includes expenses related to police protection as well as fire protection. In addition to the wages and benefits for fire fighters that are covered by the CBA, it also includes supplies, wages and benefits for civilian support staff, building maintenance, utilities, fire trucks, ambulances, and the like. She testified that about 85% of the total fire department budget is attributable to personnel cost. However, there is no summary judgment evidence showing the amount of personnel cost related to classified versus civilian personnel, the breakdown of the 66% public safety budget for fire, as opposed to police, or the amount of the total fire department budget. Moreover, the summary judgment evidence shows the City has paid the expenses associated with its obligations under the CBA without running a deficit and, notwithstanding the high "public safety" cost, in 2015, after the CBA went into

evergreen, the City increased the number of classified fire fighter and police positions for fiscal year 2016 and reduced the City's property tax rate.

We conclude the City failed to conclusively establish the CBA, as extended by the evergreen clause, is terminable at will or void because it violates public policy.

### CONCLUSION

For these reasons, we hold the trial court did not err in denying the City's motion for summary judgment.