**MUNICIPAL ADMINISTRATIVE SERVICES, INC., Appellant,**

v.

**CITY OF BEAUMONT, Appellee.**

No. 06–97–00072–CV.

Court of Appeals of Texas, Texarkana.

Submitted Jan. 28, 1998.

Decided March 27, 1998.

John R. Mercy, Atchley, Russell, Waldrop, Texarkana, James DeAnda, Laura Friedl Jones, Solar & Fernandes, Houston, for Appellant.

Jon B. Burmeister, Ethan L. Shaw, Moore Landrey, L.L.P., Beaumont, for Appellee.

Before CORNELIUS, C.J., and GRANT and ROSS, JJ.

## OPINION

GRANT, Justice.

Municipal Administrative Services, Inc. (MAS) appeals from a judgment *non obstante veredicto* rendered in favor of the City of Beaumont (the City) in MAS's suit for breach of contract. The overriding issue in this case is whether MAS properly performed an audit and, if so, whether that performance entitled them to a portion of the City's recovery of money from Southwestern Bell Telephone Company (SWB). The recovery from SWB was the result of a settlement in a class action suit by the City and numerous other cities.

MAS raises nine points of error challenging the trial court's judgment n.o.v. MAS contends that the trial court erred in granting judgment n.o.v. because the evidence supported the jury's findings that MAS complied with the contract and that their compliance resulted in the City's recovery of money. MAS also contends that the trial court erred in excluding evidence presented by MAS. Finally, MAS challenges the judgment n.o.v. on each of the remaining points raised in the City's motion for judgment n.o.v.

The City raises three cross-points based on insufficiency of the evidence and requests a new trial in the event that this Court determines that judgment n.o.v. was improper.

## Judgment N.O.V. Standard of Review

A trial court may disregard a jury's findings and grant a motion for judgment n.o.v. pursuant to Texas Rules of Civil Procedure 301 and 324(c) only when there is no evidence upon which the jury could have made its findings.[1] In reviewing the grant of a motion for judgment n.o.v., the reviewing court must determine whether there is any evidence upon which the jury could have made the finding. The record is reviewed in the light most favorable to the finding, considering only the evidence and inferences which support them and rejecting the evidence and inferences contrary to the findings.[2] When there is more than a scintilla of competent evidence to support the jury's finding, the judgment n.o.v. should be reversed.[3] The Supreme Court has held that when the trial court states no reason why judgment n.o.v. was granted, and the motion presents multiple grounds upon which judgment n.o.v. should be granted, the appellant has the burden of showing that the judgment cannot be sustained on any of the grounds stated in the motion.[4] In *Angelo Broadcasting, Inc. v. Satellite Music Network, Inc.*, the Dallas court held that the converse is also true.[5] There, the court stated that when the trial court specifies its reason for granting a judgment n.o.v., the appellant need only discredit that ground of the appellee's motion.[6]

In the present case, the trial court stated in the judgment that there was no evidence of probative force to sustain the verdict of the jury and that because a directed verdict would have been proper, judgment n.o.v. should be rendered in favor of the City and against MAS.

A judgment n.o.v. is similar to a directed verdict.[7] The reviewing court may affirm a directed verdict even if the trial court's rationale for granting the directed verdict is erroneous, provided it can be supported on another basis.[8]

Out of an abundance of caution, we shall review all points presented in the motion for judgment n.o.v. in the event the basis for the judgment n.o.v. given by the trial court is deemed not to be specific.[9]

## Evidence to Support Jury's Findings

This appeal arises from a contract for the preparation of a franchise compliance audit. A "franchise" in this context is a contract entered into between a city and a public utility which governs that utility's operation within the city. A "franchise compliance audit" is a review of a franchise and a utility's obligations thereunder to determine whether the utility is complying with the terms of the franchise.

Evidence presented at trial showed that MAS performs franchise compliance audits for cities. On June 23, 1987, MAS entered into a contract with the City of Beaumont to perform a franchise compliance audit of SWB. SWB was operating under a twenty-year franchise agreement signed in 1985.

1. *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 227 (Tex.1990).

2. *Navarette v. Temple Indep. Sch. Dist.*, 706 S.W.2d 308, 309 (Tex.1986).

3. *Southern States Transp., Inc. v. State*, 774 S.W.2d 639, 640 (Tex.1989); *Navarette*, 706 S.W.2d at 309.

4. *Fort Bend County Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex.1991), *citing Monk v. Dallas Brake & Clutch Serv. Co.*, 697 S.W.2d 780, 783–84 (Tex.App.—Dallas 1985, writ ref'd n.r.e.).

5. 836 S.W.2d 726, 733 (Tex.App.—Dallas 1992), *overruled on other grounds, Hines v. Hash*, 843 S.W.2d 464, 467 (Tex.1992).

6. *Id.*

7. *Artripe v. Hughes*, 857 S.W.2d 82, 85 (Tex. App.—Corpus Christi 1993, writ denied).

8. *Kelly v. Diocese of Corpus Christi*, 832 S.W.2d 88, 90 (Tex.App.—Corpus Christi 1992, writ dism'd w.o.j.).

9. *See Cates v. Cincinnati Life Ins. Co.*, 947 S.W.2d 608 (Tex.App.—Texarkana 1997, no writ); *Cates v. Cincinnati Life Ins. Co.*, 909 S.W.2d 186 (Tex.App.—Texarkana 1995), *rev'd*, 927 S.W.2d 623 (Tex.1996).

The agreement provided that SWB was to pay the City "three percent (3%) of the annual gross receipts for the preceding year received by [SWB] from the rendition of local telephone transmission service within the corporate limits of City." Under the terms of the franchise compliance audit contract, MAS's audit of SWB was to determine if any franchise fees or other amounts were owed to the City and to verify other pertinent information.

MAS argues that the trial court erred in granting judgment n.o.v. because evidence presented at trial supported the jury's finding that MAS complied with its franchise compliance audit contract with the City. Jury Question No. 1 asked whether MAS complied with all material obligations of the June 23, 1987, contract. The jury answered, "Yes."

MAS provided the City with a written report containing its findings regarding its franchise compliance audit of SWB on February 17, 1988. In the report, MAS concluded that SWB was not paying properly on all revenue accounts subject to the terms of the franchise and that SWB owed over one million dollars to the City. MAS identified SWB's failure to pay franchise fees on access charges and revenue excluded by SWB. MAS also suggested negotiation of a new franchise agreement. This February 17 report did not give actual amounts owed by SWB, as SWB had refused to allow access to necessary revenue information. MAS provided another report on May 6, 1988, based on additional information from SWB.

■ In its motion, the City argued that it was entitled to judgment n.o.v. as the evidence at trial showed that MAS had not complied with the contract because (1) MAS did not perform an audit as a matter of law, and (2) MAS failed to verify items 3(b) and 3(c) as required by the contract between MAS and the City.

MAS contends that paragraph three of the contract sets out the exact scope of the audit to be performed by MAS. Paragraph three provides:

3. The audits to be conducted by M.A.S. shall be to determine if any franchise fees or other amounts are now due and owing the City and shall include verification of the following:

(a) that all customers located within City are correctly coded as being within the City;

(b) that all the Companies' revenue accounts have been included in the base for calculation of the franchise fee pursuant to the franchise agreement; and

(c) that the Companies have included any new sources of revenue in the base for calculation of the franchise fee paid the City.

Betty Dunkerly, Beaumont's former finance director, and Lane Nichols, Beaumont's city attorney, testified regarding the scope of work under the contract. Both Dunkerly and Nichols testified that paragraph three of the contract defines the scope of work to be performed by MAS. Further, Nichols, through deposition impeachment, testified that he only first concluded that MAS had not performed an audit *after* MAS sued Beaumont for payment on the contract.

MAS owner George White testified that paragraph three sets out the scope of work required, and he described the work performed in satisfaction of the individual requirements of that paragraph. Based on information provided by SWB, including a chart of accounts, lists of revenue accounts subject to franchise fees, detailed listings by month of all revenue that SWB received, and other documents, MAS determined that some accounts were excluded from the City's payment base. MAS's report identified the accounts excluded. White testified that MAS found from the information provided by SWB that SWB owed franchise fees to the City. He described in detail additional work performed in satisfaction of paragraph three of the contract.

Bruce Wecker, an attorney in the class action suit, was called by the City. Wecker testified that the class action expert used the same methodology as MAS in calculating excluded revenues. He also admitted that MAS had identified excluded revenues in its report to the City.

Ray Riley, city manager for the City of Beaumont, testified by videotape. He stated

that he was not aware of MAS failing to provide the City of Beaumont with anything that they agreed to provide under the terms of the June 23, 1987, contract.

The evidence outlined above is some evidence that MAS performed an audit as required by the contract.

■ In its motion, the City also argued that MAS did not comply with the terms of the contract as a matter of law because MAS failed to provide an audit within the required time as set out in paragraph seven. Paragraph seven provides that all services were to be completed within 120 days from the date of the letter agreement. The February 17, 1988, report, the first of two reports prepared by MAS, was four months overdue.

■ The fact that a contract specifies a date for performance does not, of itself, mean that time is of the essence.[10] Ordinarily, time is not of the essence of a contract.[11] Any intention to make time of the essence in the performance of a contract must be clearly manifested from a consideration of the contract as a whole, and when that intention is not made clear by the language in the contract itself, the surrounding circumstances may be taken into consideration in determining that question.[12] The MAS contract did not specify that time was of the essence.

MAS contends that evidence presented of the City's conduct during the audit also shows that the City did not consider time to be a material term of the contract. We agree. MAS presented evidence that the City corresponded with SWB after the 120-day deadline, directing them to forward information to MAS so that MAS could complete its audit. MAS also presented evidence that the City never told them to stop the audit because the deadline had passed, that the City did not refuse acceptance of MAS's February 17, 1988, report, and that the City used the report to attempt collection from SWB. The City also invited MAS to attend meetings and negotiations with SWB after the deadline.

We find that evidence was presented which supports the jury's finding that MAS complied with all material obligations of the June 23, 1987, contract between itself and the City of Beaumont. Therefore, we sustain this point of error.

■ MAS argues that the trial court erred in granting judgment n.o.v. because the evidence presented at trial supported the jury's finding that MAS's franchise audit summary findings resulted in the collection of money by the City. In their motion for judgment n.o.v. the City argued that there was no evidence to support this finding.

Paragraph five of the contract requires payment to MAS of fifty percent of any amounts recovered, refunded, or credited to the City *as a result of* any of the audit findings. Jury Question No. 2 asked whether the audit findings, if any, provided by MAS to the City resulted in the collection of money by the City. The jury answered, "Yes."

Evidence presented showed that, in its February 17, 1988, report, MAS told the City that SWB had not been paying properly on all revenue accounts and listed those accounts by category and number. MAS also estimated the amount owed by SWB at more than one million dollars. White testified that, as far as he knew, the City was unaware that SWB was not paying on the categories of revenue identified by MAS prior to MAS's report.

The evidence also showed that, after receiving the report, the City made MAS's findings available to SWB and used them to attempt collection from SWB. As late as September 1990, the City used MAS's findings when discussing with a Beaumont law firm the possibility of filing a lawsuit to collect against SWB. In 1991 or 1992, the City and SWB began negotiating a new franchise

**10.** *Argos Resources, Inc. v. May Petroleum Inc.,* 693 S.W.2d 663, 664–65 (Tex.App.-Dallas 1985, writ ref'd n.r.e.), *citing Laredo Hides Co. v. H & H Meat Products Co.,* 513 S.W.2d 210, 217 (Tex. Civ.App.—Corpus Christi 1974, writ ref'd n.r.e.).

**11.** *Laredo Hides Co.,* 513 S.W.2d.at 216.

**12.** *Id.* at 217.

agreement using MAS's findings. MAS had suggested such negotiation in 1988.

MAS also presented evidence that it worked with the City in the collection of money from SWB by attending and participating in meetings and negotiations with SWB and by conferring with other cities.

Negotiations with SWB were unsuccessful. On February 4, 1992, the Beaumont City Council passed a resolution authorizing the city attorney to take any necessary action, including litigation, to collect the amounts owed by SWB. On February 19, 1992, the City entered into a contingency fee contract with two law firms to represent the City in connection with class action litigation to be filed against SWB. Beaumont city attorney Lane Nichols testified that these firms provided no new information to the City regarding SWB's underpayment of franchise fees. The class action suit was filed on March 9, 1992, with Port Arthur named as the class representative. The City joined the class action, and on September 11, 1995, received $1,684,614, its share of an over $20 million settlement with SWB. The City also received as a part of the settlement future credits of $1.8 million and a new franchise agreement.

The franchise compliance audit contract provides that MAS is to receive a percentage of any amounts recovered, refunded, or credited to the City "as a result of" any of the audit findings. The contract does not require that MAS pursue collection on the City's behalf. In fact, the contract does not require MAS's participation in any collection efforts.

The evidence supports the jury's finding that MAS's franchise audit summary findings resulted in the collection of money by the City. We sustain this point of error.

■ MAS argues that the trial court erred in granting judgment n.o.v. when the evidence supported the jury's award of $842,-307. The award represents fifty percent of the class action settlement. MAS relies on its argument that the City received money as

a result of MAS's audit summary, as set out in the previous point of error.

■ Evidence presented showed that the City received $1,684,614 from the class action settlement. The settlement covered the years 1984 through 1994. MAS's audit covered the years 1983 through 1986. The contract does not limit MAS's recovery to the period for which MAS conducted its audit. A proper measure of damages in a breach of contract case is the loss of contractual profit.[13]

MAS presented evidence that it was the first to discover that SWB was improperly excluding access charges and other revenue accounts from the City's franchise base. These findings were disclosed to the City in MAS's audit report, which in turn led the City to collection procedures, including participation in the class action suit. The class action suit led to the City's recovery of $1,684,614.

■ The City complains that MAS has not accurately proved that the amount of damages found by the jury resulted from the City's failure to comply with the contract in question. Pursuant to the terms of the contract, MAS had notified the City that it estimated that over a million dollars due from SWB to the City had not been paid. The purpose of the contract with MAS was to discover unpaid amounts, and the sole remuneration to MAS was to be on that basis.

The City contends specifically that the amount recoverable should have been limited to the years of 1983 through 1986, which were the years covered by the audit summary findings. The City requested the trial court to so instruct the jury and duly objected to the question as worded. The trial court denied the requested instruction limiting damages to the years of the audit summary findings, and the City has waived any error in that regard in failing to preserve this objection by cross-point of appeal.

Furthermore, the terms of the contract provide a fee for MAS based on any amounts recovered, refunded, or credited as a result

---

**13.** 4 State Bar of Texas, Texas Pattern Jury Charges PJC 110.03 (1990); *see Community Development Service v. Replacement Parts Manufacturing,* 679 S.W.2d 721, 725 (Tex.App.—Houston [1 st Dist.] 1984, no writ).

of any audit findings, including fifty percent of the value of any other compensation given the City as a result of any of the audit findings. The jury was so instructed; thus, to the extent that SWB continued to fail to pay this money due the City and that the City later recovered, the jury could have determined that the money ultimately obtained from SWB resulted from MAS's discovery of SWB's failure to include such sums in its payment to the City.

▬ The City, in its brief, contends that the proper figure attributable to MAS's work cannot be ascertained from the settlement. The City points out that the class action lawsuit covered a period from 1984 to 1994 and involved fifty-seven cities, and also involved the failure of SWB to pay the City on other bases besides those revealed in MAS's audit report.

▬ The City made no effort to show what amounts were not connected with the SWB audit findings. A party who breaches its contract cannot escape liability because it is impossible to state or prove a perfect measure of damages.[14] MAS had no control over the litigation or the settlement of the class action suit. MAS cannot be denied its right to recover because the City, who was a litigant, entered into a settlement creating uncertainty as to the amounts attributable to the specific areas to which MAS had advised the City of SWB's failure to pay. To allow the City to exclude all payments because of its decision to commingle its litigation with that of other cities and failure to seek a settlement specifying what amounts of money represented the settlement on this specific matter would allow a party to a contingency fee contract to avoid payment by making the exact amount difficult or impossible to ascertain. We cannot deny payment and recognition of the jury's finding based upon the acts of the City, which ultimately made these exact amounts impossible to discover.

The City also argues that part of the class action suit recovery was for Yellow Pages advertising fees, an area of nonpayment that the City says was never discovered by MAS. The City cites Wecker's testimony on this issue. Wecker recanted his statement that MAS did not report Yellow Pages as excluded revenue, and the audit report identified Yellow Pages revenue as excluded revenue.

We find there is evidence to support the jury's award of $842,307, fifty percent of the City's recovery from the class action settlement. We sustain MAS's point of error. Also, the jury findings as to damages were also not against the overwhelming weight of the evidence. Therefore, we overrule the City's cross-point as to damages.

### Constitutional Validity of the MAS/City Contract

▬ In their motion for judgment n.o.v., the City argued that MAS's contract was void under Article XI, sections 5 and 7 of the Texas Constitution because it is a pure contingency fee contract. Section 5 of Article XI provides, in part that:

[N]o debt shall ever be created by any city, unless at the same time provision be made to assess and collect annually a sufficient sum to pay the interest thereon and creating a sinking fund of at least two percent thereon.[15]

Section 7 provides:

But no debt for any purpose shall ever be incurred in any manner by any city or county unless provision is made, at the time of creating the same, for levying and collecting a sufficient tax to pay the interest thereon and provide at least two per cent (2%) as a sinking fund. . . . [16]

▬ The framers' intent in creating these provisions was to protect a city's financial standing and its other creditors.[17] Sections 5 and 7 of Article XI were adopted to limit a

14. *Southwestern Chemical & Gas Corp. v. Southeastern Pipe Line Co.*, 369 S.W.2d 489, 495 (Tex. Civ.App.—Houston [1 st Dist.] 1963, no writ), citing *Southwest Battery Corporation v. Owen*, 131 Tex. 423, 115 S.W.2d 1097 (1938).

15. Tex. Const. art. XI, § 5.

16. Tex. Const. art. XI, § 7.

17. *City of Terrell v. Dissaint*, 71 Tex. 770, 9 S.W. 593, 594 (1888).

city's ability to pledge future revenues for current obligations.[18]

The City argues that the contract is void because it failed to dedicate any cash recovery from SWB to pay MAS's compensation and because the contract is a debt.

The City directs this court to several cases in which contracts entered into by cities and counties, which created future obligations without creating sinking funds to pay on those contracts, were held unconstitutional. The cases involve contracts whereby the city incurred a pecuniary obligation at the time of the contract's execution, but where the city had not made any provision for paying that debt in the future when it became due. The cases are distinguishable from this case because none address the constitutionality of pure contingency fee contracts.

A "debt" for the purposes of the above sections, means any pecuniary obligation imposed by contract.[19] A contract does not create a debt if the parties lawfully and reasonably contemplate that the obligation will be satisfied out of current revenues or out of some fund then within the immediate control of the governing body.[20] A contract that creates a future pecuniary obligation which depends on the contingency of future events is still a debt.[21]

MAS argues that the constitutional provisions cited do not require a sinking fund unless and until a debt has actually been incurred. No unconstitutional "debt" ever arises under MAS's pure contingency fee contract, it claims, because until amounts are received as a result of MAS's audit findings no money is due and because collection from SWB creates the fund out of which MAS is to be paid. We agree.

Because no debt was created unless and until the City actually collected from SWB, and because such collection would result in the creation of funds out of which MAS would be paid, the contingency fee contract does not violate Sections 5 and 7 of Article XI.

The City also argues that, because the contract gives MAS fifty percent of any amounts "credited" to the City, pecuniary obligations to MAS did not depend on recovery of cash and therefore impermissibly would be paid from general revenues. This ground was not raised in the City's motion for judgment n.o.v. at the trial court level. To preserve a complaint for appellate review, a party must present its complaint to the trial court and must state the specific grounds for the ruling it desires if the specific grounds are not apparent from the context.[22] A party is not permitted to expand a point of error on appeal to include an objection not made at trial.[23] This point of error is waived.

### Defects of the Sale of MAS's Assets

The City alleged defects in the form of the sale of MAS's assets from one partner to another after MAS had completed its franchise compliance audit. The City argued that these defects bar MAS from recovering the money owed by the City under the terms of MAS's June 23, 1987, contract.

MAS was formed in 1987 by George White and Susan Hodge, who were the only directors, officers, and shareholders of the company. MAS contracted with the City in 1987. In 1990, White formed Municipal Consulting Group, Inc., which purchased all of the assets of MAS, including all of MAS's contracts, accounts receivable, and its name.

**18.** *Panhandle Constr. Co. v. City of Spearman,* 83 S.W.2d 425, 427 (Tex.Civ.App.—Amarillo 1935, writ dism'd w.o.j.).

**19.** *McNeill v. City of Waco,* 89 Tex. 83, 33 S.W. 322, 324 (1895); *City–County Solid Waste Control Bd. v. Capital City Leasing, Inc.,* 813 S.W.2d 705, 707 (Tex.App.—Austin 1991, writ denied).

**20.** *Id.*

**21.** *Texas & New Orleans Railway v. Galveston County,* 141 Tex. 34, 169 S.W.2d 713, 715 (1943).

**22.** *Commonwealth Lloyd's Ins. Co. v. Thomas,* 825 S.W.2d 135, 147 (Tex.App.—Dallas 1992), *judgmt. vac. by settlement agr. of parties,* 843 S.W.2d 486 (Tex.1993); Tex.R.App.P. 33.1(a) (formerly Tex.R.App.P. 52(a)).

**23.** *PIC Realty Corp. v. Southfield Farms, Inc.,* 832 S.W.2d 610, 614 (Tex.App.—Corpus Christi 1992, no writ); *see also Hill v. Clayton,* 827 S.W.2d 570, 574 (Tex.App.—Corpus Christi 1992, no writ.

The lawsuit against the City was filed on July 3, 1996. Hodge officially ratified the sale of MAS as a director, officer, and shareholder during the trial on February 18, 1997.

Article 5.10 of the Texas Business Corporation Act requires special shareholder authorization for the sale of all or substantially all of a corporations assets. The City contends that Hodge's ratification came too late to satisfy the requirement of Article 5.10. However, Article 5.10 does not include any time limitation for ratification. Furthermore, the City has no standing to challenge failures, if any, in the ratification of the sale of MAS's assets.

### Conditions Precedent

 The City argued in its motion for judgment n.o.v. that MAS failed to comply with conditions precedent found in the contract. The City specifically points to MAS's failure to perform an audit within 120 days and to verify certain information. A condition precedent is an act which must occur before there is a right to performance or before there is a breach of contractual duty.[24] In order to determine whether a condition precedent exists, the intention of the parties must be ascertained.[25] In order to make performance specifically conditional, a term such as "if," "provided that," "on condition that," or some similar phrase of conditional language must normally be included.[26] If no such language is used, the terms are to be construed as a covenant in order to prevent a forfeiture.[27] While there is no requirement that such phrases be used, their absence is probative of the parties' intention that a promise be made, rather than a condition imposed.[28] Finally, in construing a contract, forfeiture by finding a condition precedent is to be avoided when another reasonable reading of the contract is possible.[29]

No conditional language appears in the MAS contract. Further, nothing in the record indicates that time was of the essence. We find that the provisions cited by the City are not conditions precedent. Therefore, the City was not entitled to judgment n.o.v. because of any failure of MAS to satisfy conditions precedent.

### Failure of Consideration

Finally, the City argued in its motion that it is entitled to judgment n.o.v. because MAS did not perform an "audit," and because MAS's franchise audit summary findings did not "result in" the collection of any money. The City relies on the same arguments presented under its sufficiency of evidence grounds. We hold that there was no failure of consideration because MAS performed an audit and because MAS's findings resulted in the City's collection of money.

### Cross–Points

 When an appellate court holds that a trial court has erroneously entered a judgment n.o.v., the appellate court must reverse the trial court's judgment and enter judgment in accordance with the verdict, unless the appellee presents cross-points sufficient to vitiate the jury's verdict or to prevent an affirmance of the judgment, had one been entered on the verdict.[30]

In three cross-points, the City argues that, in the event this court finds that there was more than a scintilla of evidence to support the jury's findings to Questions 1–3, then the court should remand for a new trial based on factual insufficiency because the jury's findings are against the overwhelming weight of the evidence. Because we addressed the substance of the City's argument on damages earlier, we now address only their remaining

---

24. *Hohenberg Brothers Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1 (Tex.1976).

25. *Criswell v. European Crossroads Shopping Center, Ltd.*, 792 S.W.2d 945, 948 (Tex.1990).

26. *Id.*

27. *Id.*

28. *Id. citing Hohenberg Bros. Co.*, 537 S.W.2d at 3.

29. *Criswell,* 792 S.W.2d at 948.

30. *Jackson v. Ewton,* 411 S.W.2d 715, 717 (Tex. 1967); *McDade v. Texas Commerce Bank Nat'l Ass'n,* 822 S.W.2d 713, 720 (Tex.App.—Houston [1 st Dist.] 1991, writ denied).

cross-points relating to the jury's findings on Questions 1 and 2.

In reviewing this factual insufficiency challenge, we must consider, weigh, and examine all of the evidence that supports and that is contrary to the jury's determination.[31] We will set aside the verdict only if the evidence standing alone is so weak as to be clearly wrong and manifestly unjust.[32] Evidence which supports the jury's verdict has been set out above.

 The City argues that the entire contract, not just paragraph three, imposed obligations on MAS and that certain material obligations were not performed. The City points specifically to paragraphs four, five, and seven.

4. At the completion of each of the audits, M.A.S. shall provide City with a final audit report which will outline the audit work performed, explain the audit findings and provide recommendations for the improvement of future franchise fee reporting and compliance efforts.

5. As compensation for the services provided hereunder, City agrees to pay M.A.S. as follows:

Fifty percent (50%) of any amounts recovered, refunded or credited as a result of any of the audit findings, including, fifty percent (50%) of the value of any other compensation given the City as a result of any of the audit findings.

. . . .

7. All Services, as described herein, shall be completed within 120 days from the date of this Letter Agreement.

The City contends that MAS did not perform an audit, as required under paragraph four. They point to the deposition testimony of Bruce Wecker to support this argument. Wecker testified that MAS's findings were seriously flawed. Wecker based this opinion on the fact that MAS relied on assumptions and estimates when it was unable to get documentation from SWB. He stated that a comparison of MAS's estimates and the actual figures obtained through class action discovery showed MAS's figure to be inaccurate. Wecker also testified that MAS's findings regarding franchise fees on Yellow Pages revenues were incorrect. However, Wecker also testified that Jack Stowe, an expert in the class action suit, similarly used estimates and assumptions in calculating excluded revenues, and he recanted his testimony regarding MAS's findings on Yellow Pages revenues.

The City also argues that MAS's report was not an audit as a matter of law because there was no formal or official examination and verification of books and accounts.[33] Dunkerly testified that MAS did not perform an audit of SWB's books.

 In construing a written contract, the primary concern is to ascertain the true intentions of the parties as expressed in the written instrument.[34] Paragraph three of the contract sets out what was required by MAS's franchise compliance audit of SWB. The evidence presented showed that the requirements of paragraph three were met; therefore, an "audit" was performed.

 The City argues that the "as a result of" language in the contract is dispositive of whether the audit findings resulted in the collection of money by the City. The City points to the testimony of Nichols, who testified that the meetings with SWB did not result in collection of money, and Wecker, who testified that MAS had no involvement in the class action lawsuit. Wecker also stated that he never used the MAS report in the preparation of the class action suit. He could not say, however, whether anyone working with him used the report. Wecker testified that the MAS report was also not listed as an exhibit, and no one from MAS was listed as a potential witness. However, as mentioned earlier, the contract did not require that MAS pursue collection on the

**31.** *Plas–Tex, Inc. v. United States Steel Corp.,* 772 S.W.2d 442, 445 (Tex.1989).

**32.** *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986).

**33.** *See General Land Office v. Rutherford Oil Corporation,* 802 S.W.2d 65, 69 (Tex.App.—Austin, 1990), *aff'd,* 852 S.W.2d 480 (Tex.1993).

**34.** *Lenape Resources Corp. v. Tennessee Gas Pipeline Co.,* 925 S.W.2d 565, 574 (Tex.1996).

City's behalf or participate in any suit against SWB.

The City argues that MAS's report was not a substantial factor in bringing about the class action settlement and, therefore, there is no direct causal relationship between the work product of MAS and the collection of money by the City.

The evidence presented showed that MAS discovered that SWB owed money to the City. MAS reported its findings to the City, and the City acted on the information. From these facts it was logical for the jury to infer that MAS's audit led to the City's settlement from SWB.

The City's cross-points are overruled. Because we find in favor of MAS, we do not address their points of error on exclusion of evidence.

The judgment of the trial court is reversed and rendered that MAS recover in accordance with the jury verdict.