

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-24-00073-CV
_____

JENNIFER CAMBAS AND LAWRENCE CAMBAS, Appellants

V.

TRINITY ROOFING & RESTORATION, LLC, Appellee

On Appeal from the 57th District Court
Bexar County, Texas
Trial Court No. 2021-CI-22664

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice van Cleef

## MEMORANDUM OPINION

A Bexar County[1] jury rendered a verdict in favor of Trinity Roofing & Restoration, LLC (Trinity), on their breach of contract and quantum meruit claims against Jennifer Cambas and Lawrence Cambas. On appeal, the Cambases argue that the jury's verdict on breach of contract was not supported by legally sufficient evidence and that Trinity's claim for damages under the contract was barred. The Cambases also argue that Trinity could not recover under quantum meruit when an oral contract existed and that Trinity was not entitled to attorney fees awarded by the trial court's judgment. Because we conclude that legally sufficient evidence supported the jury's finding that the Cambases materially breached the contract, that Trinity's right to recovery was not barred, that Trinity's quantum meruit recovery was not barred, and that Trinity was entitled to attorney fees, we affirm the trial court's judgment.

## I.    Factual and Procedural Background

The Cambases owned a rental home located at 8518 Quail Sun, San Antonio, Texas 78250 (the Property). After their former renter caused a substantial amount of severe water damage in 2020 to most of the home, the Cambases filed a claim with their insurance company, MetLife. When their MetLife agent recommended Trinity for the repairs required to restore the home, the Cambases contacted Trinity's owner, Adrienne Brickley.

After Brickley informed the Cambases that Trinity was experienced in repairing water damage, the Cambases hired Trinity to perform the repairs. Trinity had Phillip Revland survey

---

[1]Originally appealed to the Fourth Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (Supp.); TEX. R. APP. P. 41.3; *Mitschke v. Borromeo*, 645 S.W.3d 251, 258 (Tex. 2022) ("Transferee courts must follow whatever law binds the transferor court . . . .").

the home and prepare an item-by-item "Xactimate," which is a tool used by MetLife and other insurance companies to estimate the cost of repair. The Xactimate, prepared on June 20, 2020, detailed every repair needed to restore the Property due to water damage in the living room, dining room, kitchen, three bathrooms, three bedrooms, the master bedroom closet, hallway, stairway, laundry room, and garage. According to the Xactimate, the cost to repair the water damage totaled $38,786.68. Although the Xactimate contained general descriptions of materials that were needed to make the repairs, it did not specify what quality materials should be used. It also noted that the "estimate [wa]s good for thirty days from 6/18/2020." To support the submission of the Xactimate to MetLife, Trinity included photos of the severe water damage throughout the Property. After MetLife approved the Xactimate, the Cambases contracted with Trinity to make the repairs.

The written contract signed by the Cambases on February 19, 2021, stated, "All work will be done according to insurance scope as Trinity Roofing and Restoration and MetLife are in agreement with estimate #2020-06-20-2141." The contract price was $36,268.38, which was less than the Xactimate price, provided that the Cambases paid the insurance deductible. At trial, Brickley testified that Trinity, a general contractor, used CHS Construction (CHS) as its subcontractor on the project. Brickley visited the Property with the subcontractor's owner, who estimated that the work could be completed in approximately four to five weeks. Accordingly, as for the timing of the work, the written contract stated, "Please allow 4-5 weeks for production. Work to begin 3/1/2021." Even so, Brickley testified that she did not guarantee that the project would be completed in that timeframe.

3

The written contract also stated, "[T]he [first insurance] check is required prior to beginning production. Once work is finished Trinity Roofing and Restoration will turn in final paperwork to insurance company to release recoverable depreciation. Balance due once final check is received from insurance company. At that time, warranty will be issued to the homeowner" for completed repairs.[2] Brickley explained that those terms were the result of MetLife's "two-check process." He continued, "One check is paid up front to the homeowner to begin all the work. And then, upon final completion invoices, [MetLife] would release final payment" to the homeowner, who would then pay Trinity.

MetLife provided the first check to the Cambases so they could pay Trinity to begin the work, and the Cambases made the first payment of $16,893.34 to Trinity on February 25, 2021. Also in February, in addition to the written contract, the Cambases made an oral agreement for voluntary upgrades. Jennifer testified that the oral agreement required Trinity to paint kitchen cabinets, upgrade the backsplash, remove popcorn ceilings, and trim trees, among other things. The total for the repairs covered by the oral agreement was $6,424.03. Trinity agreed to perform the upgrades and provided the Cambases with a separate, written invoice for the work completed, totaling $6,424.03.

Additionally, there had been a hailstorm around that time, and on the Cambases' request, Trinity inspected the roof and concluded it was damaged. Trinity sent its findings to MetLife, which agreed with Trinity and approved the Cambases' claim to repair the roof damage. Trinity replaced the roof, and text messages showed that the Cambases were happy with the new roof.

---

[2]The written contract provided for a five-year workmanship warranty.

4

According to Brickley, while Trinity completed the repairs required by the oral agreement and the roof repair, it was difficult to complete the repairs related to the written contract because of the COVID-19 pandemic, which caused delays in obtaining construction materials. Brickley testified that the repairs began in March 2021, but they were not completed until July. She testified that, based on representations from CHS that it "was getting close to the end," she submitted a certificate of completion to MetLife in March so it would "release final payment to the Cambases." Jennifer said she did not tell Brickley that they were satisfied with the completion of the project as of March 19, 2021, which is when MetLife issued the final check to the Cambases.

Brickley testified that the Cambases chose the materials for the repairs, including flooring and tile, and that Trinity installed the materials chosen. Brickley introduced text messages between her and the Cambases confirming the materials they had selected. The text messages also showed that the Cambases were initially happy with the living room floors. In May, based on CHS's representation, Brickley assured the Cambases that the repairs would be completed that month but then had to notify them that CHS's workers had gotten sick and that more delays were expected. However, as the weeks progressed, Brickley determined that her reliance on CHS's estimated timeline was misplaced.

In May 2021, the Cambases found a renter for the Property who signed a rental agreement beginning August 1. That same month, Lawrence voiced his disapproval that the project had not yet been completed and informed Brickley that he was going to ask MetLife to get another contractor to do the repairs, but Brickley convinced the Cambases to allow her to

continue working. Brickley testified that she fired CHS as her subcontractor because it had already been paid $2,000.00 over its bid and was not "moving on production." As a result, she replaced CHS with Dr. Fix-It, a construction company owned by Daniel and Rosa Hernandez.

Lawrence testified that, by that time, he and Jennifer had a problem with the living room flooring due to gaps and scratching. Brickley testified that, when the Cambases expressed problems with the installed flooring, Trinity repurchased the floors that the Cambases had chosen at no additional cost to them and had Dr. Fix-It install it to make them happy. Both Rosa and Daniel testified that the living room floor installed by CHS was opening up due to an improper plastic underlayment and that they completed the living room floor re-installation with a proper underlayment. According to Brickley, the living room flooring was of good quality.

On July 5, when the Cambases expressed concerns with some bathroom flooring installed by CHS, Brickley sent a text message stating,

> I'm redoing the bathroom tile in the bathroom upstairs. I just wanted you to accept my deepest apologies for the mess [CHS] put us both through. I feel beyond embarrassed. If you only know how hard it was. I busted my tail to get where I'm at today. It's not by doing shoddy work. I do hope you don't judge my character by what [CHS] did. I personally have been there every day. I won't just leave you disappointed.

The next day, Brickley texted photos of the reset bathroom tile, with a text stating, "All done over and perfect now," and Jennifer responded to the photos and text with a thumbs-up emoji. Text messages also show that the Cambases said the shower tile "look[ed] really good" and that, after being sent photos of the redone living room floors, Jennifer sent a thumbs-up emoji on July 13 and said, "Looking good."

6

On July 19, Brickley met with the Cambases at the Property to complete a walkthrough and collect the final payments for the work under the written contract and oral agreement. According to Brickley, the Cambases said they needed three or four items addressed. Brickley testified, and the Cambases admitted, that Lawrence tendered one check for the full payment of the oral agreement, totaling $6,424.03, and another check for $14,393.34, which was for $5,000.00 less than the final payment required on the written contract. Brickley said that she had agreed to the Cambases' request to hold back the $5,000.00 until they finished the three or four listed items, which would be completed the next day. Via text message on July 19, Lawrence asked Brickley if she had received his notes, and Brickley responded that she had, was "on it," and that everything would be cleaned up.

On July 20, Dr. Fix-It arrived with a crew of four or five people, not including the Hernandez's, to complete the final checklist. Unfortunately for the Cambases, termites were discovered in the living room wall that morning. Daniel testified that they were not finished with the repairs at noon, but that they "were about to finish" and remained on the Property until 7:00 or 8:00 p.m. Brickley testified that her daughter-in-law, Cynthia Brickley, was with her at the Property, along with Dr. Fix-It and the pest control people, that she and Jennifer walked the Property, and that Jennifer wrote her the final $5,000.00 payment after speaking with Lawrence on speakerphone and obtaining his permission to do so.

According to Jennifer, the repairs under the written contract were not complete, but Brickley said she was not going to finish the job unless she received the final check. Jennifer said she wrote the check for the balance of the written contract, even though the work was

7

allegedly not finished because she "was tired of [Brickley] badgering [her] and just telling [her], I need a check." As an example of what had not been finished, Jennifer testified that they were supposed to have had French doors in one of the rooms, but she did not get them. Brickley testified that the Xactimate included French doors, but the Cambases had ordered custom French doors that would take at least three weeks for the order to ship. According to Brickley, the Cambases did not want to wait for the French doors and, as a result, Dr. Fix-It made pocket doors that looked like French doors, which the Cambases were happy with. Brickley included text messages showing that the Cambases approved of the doors made to look like French doors.

Cynthia testified that she went with Brickley to pick up final payment from Jennifer on July 20, that Jennifer wrote a check for $5,000.00, and that there was no confrontation. Cynthia testified that Brickley did not corner Jennifer or force her to write the check. She added that Rosa and Daniel were there to handle "a couple of things that [they] had to touch up."

Brickley testified that the work under the oral agreement and written contract was completed on July 20 by 8:00 p.m. and that she deposited the $6,424.03 and $14,393.34 checks written on July 19, and the $5,000.00 check written on July 20. After Brickley had deposited the checks, both Brickley and Jennifer testified that Jennifer asked Trinity to submit a bid for termite repair. Jennifer said she asked Trinity for the bid despite being unsatisfied with their work.

The Cambases' bank records showed, and Lawrence admitted, that their bank account did not have sufficient funds to cover the checks written on July 19, that the $6,424.03 was returned for insufficient funds, and that Lawrence placed a stop payment on the checks for $14,393.34 and $5,000.00. Lawrence admitted that he had not cashed the second MetLife check either.

8

Even so, he testified that he had fired Trinity on July 20 and had instead hired their subcontractor, Dr. Fix-It.

In October 2021, Trinity sued the Cambases. Trinity brought claims for breach of the oral agreement and written contract arguing that they had substantially performed while the Cambases had failed to keep their promise to pay. In the alternative, Trinity raised causes of action for quantum meruit and promissory estoppel.

In response, the Cambases filed counterclaims and a third-party claim against Brickley, alleging that the repairs were not completed in a good and workmanlike manner and were not completed on time. As a result, the Cambases filed counterclaims for breach of contract, breach of warranty, deceptive trade practices, fraudulent inducement, common law fraud, negligence, and negligent misrepresentation. The Cambases also alleged that Trinity was an alter ego of Brickley.

The trial court granted the Cambases' partial motion for summary judgment on Trinity's claim for quantum meruit "as to the express contracts executed on February 19, 2021, and March 27, 2021," but denied the motion "as to the parties' oral contract surrounding upgrades" to the Property "in the amount of $6,424.00." The trial court also granted Trinity's no-evidence motion for summary judgment on the Cambases' claims for breach of warranty, deceptive trade practices, fraudulent inducement, common law fraud, negligence, negligent misrepresentation, and alter ego. The remaining issues were submitted to a jury.

At trial, in addition to the evidence recited above, Lawrence admitted that Trinity had completed the oral agreement and that he raised no issues regarding their roof repair with

9

Brickley. Even though he had written the July 19 checks, Lawrence testified that, as of that date, there was still a lot of work left to be done, there "was paint all over the place," there were issues with the bathroom tile, and the living room floors were inadequate. Even though Jennifer testified that she voiced no objection to the living room flooring installed by Dr. Fix-It, both Jennifer and Lawrence believed that Brickley had purchased cheaper flooring than what they had chosen. Lawrence and Jennifer also testified that they believed Trinity's workmanship was poor. They both admitted photos into evidence, but the photos, unlike those submitted by Trinity, were undated.

Mark Stuart, an architect, residential building inspector, and former contractor, testified that he was familiar with the "standard of good and workmanlike manner." Stuart testified that the Cambases did not like the look of the laminate flooring they had chosen and were not happy with its installation. Stuart testified that he spoke to the Cambases about all the issues they had with Trinity's work, inspected the Property and work that Trinity performed, and concluded that Trinity had performed the work in a good and workmanlike manner. Stuart did, however, point out some items that remained to be finished "that a contractor might be willing to do," and his report included a proposed contract adjustment of $4,907.00.

The Cambases' renter moved in as scheduled on August 1. The next year, after they had been sued, the Cambases hired Jason Rozacky, a master licensed certified professional inspector, to inspect the Property on September 8, 2022. Rozacky testified about alleged deficiencies in the work, but ultimately said he was unaware of what repairs Trinity was charged with making and

10

could not attribute the deficiencies to Trinity since other contractors had been hired to work on the Property after Trinity left.

The jury saw before and after photos of Trinity's work, heard the Cambases' evidence of missing or poorly completed work, heard Trinity's evidence about the work completed, and found the following: (1) Trinity and the Cambases "enter[ed] into a contract for work to be done in accordance with the insurance's scope of work," (2) the Cambases materially failed to comply with the written contract first, (3) Trinity did not materially fail to comply with the written contract, (4) Trinity substantially performed the written contract, and (5) $19,393.04 would fairly and reasonably compensate Trinity for the damages resulting from the Cambases' breach.[3] As for Trinity's quantum meruit claim on the oral agreement, the jury determined that Trinity performed compensable work for the Cambases and received no compensation in return. Accordingly, the jury awarded Trinity $6,424.03 for the work performed. The jury found that Trinity's failure to comply with the warranty, if any, was not a producing cause of any damages to the Cambases, that neither Trinity nor Brickley fraudulently induced the Cambases into any contract, and that Trinity and Brickley did not commit fraud during their performance of work on the Property.

After the verdict, Trinity moved for an award of attorney fees for breach of contract and as the prevailing party. It submitted the affidavit of its trial counsel, Abasi Major, who attached detailed billing records showing that 432.55 hours of work was performed by attorneys and

---

[3]The jury also found that Trinity substantially relied to its detriment on the Cambases' promise in the written contract, that their reliance was foreseeable, and that $25,817.07 was the sum that would fairly and reasonably compensate Trinity for its damages resulting from the Cambases' promise.

assistants, that the attorneys and assistants billed at different rates, and that a total of $95,984.63 of work was completed as reasonable and necessary.

In its final judgment for Trinity, the trial court entered judgment on Trinity's breach of the written contract and awarded it $19,393.04. The trial court noted that Trinity elected to recover under its quantum meruit theory instead of promissory estoppel for the oral agreement and awarded judgment on that claim for $6,424.03. The final judgment awarded Trinity attorney fees in the amount of $76,500.00. The trial court also entered a take-nothing judgment on the Cambases' claims. The Cambases filed a motion for new trial and a motion for judgment notwithstanding the verdict, but both motions were denied.

## II.   Legally Sufficient Evidence Supported the Jury's Findings that the Cambases Breached the Written Contract First

The jury found that the Cambases materially breached the written contract while Trinity did not. By a separate question, the jury also found that the Cambases breached the written contract first. In their first point of error, the Cambases argue that those findings were not supported by legally sufficient evidence.

### A.   Standard of Review

Both Trinity and the Cambases had the burden to prove that the other breached the written contract. An appellant attacking the legal sufficiency of an adverse finding on which it did not have the burden of proof at trial must demonstrate that there is no evidence to support the adverse finding. *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 215 (Tex. 2011). When a party challenges the legal sufficiency of the evidence to support an adverse finding on an issue for which it had the burden of proof, that party "must demonstrate on appeal that the

12

evidence establishes, as a matter of law, all vital facts in support of the issue." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam). "Evidence is legally sufficient if it 'would enable reasonable and fair-minded people to reach the verdict under review.'" *Exxon Corp.*, 348 S.W.3d at 215 (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). "We 'credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not.'" *Id.* (quoting *City of Keller*, 168 S.W.3d at 827).

"Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony." *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). "They may choose to believe one witness and disbelieve another." *Id.* "Reviewing courts cannot impose their own opinions to the contrary." *Id.* As a result, "[c]ourts reviewing all the evidence in a light favorable to the verdict . . . assume that jurors credited testimony favorable to the verdict and disbelieved testimony contrary to it."[4] *Id.*

### B. Analysis

The Cambases' argument is premised on the theory that time was of the essence in the written contract because it stated, "Please allow 4-5 weeks for production. Work to begin 3/1/2021." Accordingly, the Cambases argue that Trinity breached a material provision of the written contract first as a matter of law and that they were discharged from the payment provisions as a result.

"It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further

---

[4]The Cambases do not raise any issue challenging the factual sufficiency of the evidence.

13

performance." *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004) (per curiam) (citing *Hernandez v. Gulf Grp. Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994)). "Generally, materiality is an issue 'to be determined by the trier of facts.'" *Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 436 (Tex. 2017) (per curiam) (quoting *Hudson v. Wakefield*, 645 S.W.2d 427, 430 (Tex. 1983)). "Like other issues of fact, materiality may be decided as a matter of law only if reasonable jurors could reach only one verdict." *Id.* (citing *City of Keller*, 168 S.W.3d at 822).

Because materiality is generally a fact issue, the following question in the trial court's charge tasked the jury with determining what provisions of the written contract were material:

**QUESTION NO. 3**

Did TRINITY ROOFING & RESTORATION, LLC fail to comply with the contract?

Answer "Yes" or "No"

**Answer:** No

**Instruction:** A failure to comply must be material. The circumstances to consider in determining whether a failure to comply is material include:

1.  The extent to which the injured party will be deprived of the benefit which he reasonably expected;

2.  The extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

3.  The extent to which the party failing to perform or to offer will suffer forfeiture;

14

4. The likelihood that the party failing to perform or to offer to perform will cure his failure, taking into account the circumstances including any reasonable assurances;

5. The extent to which behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.[5]

The instructions in the trial court's jury charge are the "factors enumerated in the Restatement that" the Texas Supreme Court has decided "are 'significant in determining whether a failure to perform is material.'" *Id.* at 436 (quoting *Mustang*, 134 S.W.3d at 199 (citing RESTATEMENT (SECOND) OF CONTRACTS § 241 (AM. LAW INST. 1981))).

The Cambases argue that no jury question should have been submitted because they showed that time was of the essence in the written contract as a matter of law. In support of their argument, the Cambases cite *Mustang*, in which the Texas Supreme Court reversed a jury verdict and stated, "[I]f it is clear the parties intend that time is of the essence to a contract, timely performance is essential to a party's right to require performance by the other party." *Mustang*, 134 S.W.3d at 196 (citing *D.E.W., Inc. v. Depco Forms, Inc.*, 827 S.W.2d 379, 382 (Tex. App.— San Antonio 1992, no writ)).

*Mustang*, however, was an exception to the general rule that materiality is a fact question. In *Mustang*, the Texas Supreme Court looked to both the terms of the written contract and the evidence and held that time was of the essence as a matter of law because the contract stated that "all time limits stated in the Contract are of the essence to the Contract" and because "100 percent completion" of the contract was required "no later than" a specified date. *Id.* at 199. To

---

5In the same manner, the jury was asked whether the Cambases' breach of the written contract was material, and they answered, "Yes."

15

ensure that the project was completed on time, the contract in *Mustang* imposed a mandatory work schedule of fourteen weeks, seven days a week, and eleven working hours daily. *Id.* at 196–97. Accordingly, *Mustang* held, under the facts of that case, "that a contractor's failure to meet a deadline in contravention of an express time-is-of-the-essence clause was a material breach as a matter of law." *Bartush-Schnitzius*, 518 S.W.3d at 437 (citing *Mustang*, 134 S.W.3d at 199–200).

Here, unlike in *Mustang*, the written contract contains no language indicating that time was of the essence. It simply stated that work would begin on March 1, 2021, and asked the Cambases to allow four to five weeks for production. Yet, "a date of performance in a contract does not in itself mean that the parties intended timely performance to be of the essence." *Jennings v. Jennings*, 625 S.W.3d 854, 865 (Tex. App.—San Antonio 2021, pet. denied); *see Mun. Admin. Servs., Inc. v. City of Beaumont*, 969 S.W.2d 31, 36 (Tex. App.—Texarkana 1998, no pet.) ("The fact that a contract specifies a date for performance does not, of itself, mean that time is of the essence."). This is because, "[o]rdinarily, time is not of the essence of a contract." *Mun. Admin. Servs., Inc.*, 969 S.W.2d at 36; *see Jennings*, 625 S.W.3d at 866 ("Unless the contract expressly makes time of the essence, the issue is a fact question." (quoting *Maroy Intern., Inc. v. Cantu*, No. 04-12-00193-CV, 2013 WL 1149066, at *2 (Tex. App.—San Antonio Mar. 20, 2013, pet. denied) (mem. op.))); *MHI P'ship, Ltd. v. DH Real Est. Inv. Co.*, No. 03-04-00485-CV, 2008 WL 3877717, at *4 (Tex. App.—Austin Aug. 20, 2008, pet. denied) (mem. op.) ("Ordinarily, time is not of the essence in contract performance." (citing *Kennedy Ship & Repair,*

16

*L.P. v. Pham*, 210 S.W.3d 11, 19 (Tex. App.—Houston [14th Dist.] 2006, no pet.))).

Accordingly,

> [a]ny intention to make time of the essence in the performance of a contract must be clearly manifested from a consideration of the contract as a whole, and when that intention is not made clear by the language in the contract itself, the surrounding circumstances may be taken into consideration in determining that question.

*Mun. Admin. Servs.*, 969 S.W.2d at 36.

In opening statements, the Cambases' own counsel said, "Now, remember, nobody was living in the house at the time, and it wasn't their own house. It wasn't like they were displaced, so there was no extreme rush to get this job done immediately back in 2020." Even so, the Cambases argue that time was of the essence because Jennifer testified, "[W]e needed it to be completed in time before we had renters in the home. So we needed -- the timing was between four to six weeks, and that was also important to us." They also point to Brickley's testimony admitting that the written contract said that the job would be completed within four to five weeks. Even so, the jury was presented with conflicting evidence as to whether time was of the essence. As noted above, Brickley testified that she did not guarantee that the project would be completed in that timeframe.

For example, the jury heard that the Cambases had no renters at the time they entered into the written contract and that no one was living in the home. After the four or five weeks had expired, the Cambases still allowed Trinity to continue making repairs. The Cambases also requested voluntary upgrades and a roof repair that delayed the repairs under the written contract. Text messages introduced into evidence show that some of the delays were caused by

17

the Cambases when they delayed meetings or were out of town. It was not until May 2021 that the Cambases secured a renter, and the start date of the rental contract was not until August 1. Moreover, the jury heard testimony that Trinity had completed the repairs by July 20 and that the renter moved in on August 1, as planned. As a result, the jury could have determined that, while the contract specified a completion date, it was not a material term of the contract.

The written contract contained no statement that time was of the essence, and the evidence on this point was conflicting. Accordingly, the question of whether the written contract's proposed time frame for completion was a material term was a fact question for the jury. *See Bartush-Schnitzius*, 518 S.W.3d at 436; *Jennings*, 625 S.W.3d at 866; *GCC Constructors, Inc. v. Am. Horizon Concrete, Inc.*, No. 01-04-00817-CV, 2007 WL 926652, at *5 (Tex. App.—Houston [1st Dist.] Mar. 29, 2007, no pet.) (mem. op.). The trial court listed the applicable five factors for the jury's consideration in evaluating whether Trinity's failure to comply was material. *See Bartush-Schnitzius*, 518 S.W.3d at 436–37. Because the parties presented evidence at trial that could have led rational jurors to reasonably disagree regarding the application of the materiality factors, including whether time was of the essence, we find that the Cambases were not entitled to a finding that time was of the essence in the written contract as a matter of law.

"[W]hen a party commits a nonmaterial breach, the other party 'is not excused from future performance . . . .'" *Id.* at 436 (quoting *Levine v. Steve Scharn Custom Homes, Inc.*, 448 S.W.3d 637, 654 (Tex. App.—Houston [1st Dist.] 2014, pet. denied)). The jury determined that Trinity's breach, if any, was nonmaterial and that the Cambases were not excused from making

18

payment under the written contract. It also found that the Cambases breached the written contract by issuing hot checks for the final payment due under that contract. Because we find that legally sufficient evidence supported the jury's findings on the written contract, we overrule the Cambases' first point of error.

## III. Trinity's Right to Recover Under the Written Contract Was Not Barred

In their second point of error, the Cambases argue that Trinity cannot recover under the theory of substantial performance because the cost of remedying the lack of performance was greater than the unpaid amount due to Trinity. We disagree.

Trinity pled both that it had "fully performed or substantially performed" the written contract.[6] In the third jury question asking whether Trinity failed to comply with the written contract, the jury answered, "No." After the third question, and before the fourth, the charge contained the following instruction: "If you answered "Yes" to Question 3, then answer the following question. Otherwise, do not answer the following question." The jury disregarded those instructions and answered the fourth question, thereby finding that Trinity substantially performed its contract. Then, the jury answered the next two questions:

**QUESTION NO. 5**

Who failed to comply with the contract first?

---

[6]"Substantial performance is 'an equitable doctrine that was adopted to allow a contractor who has substantially completed a construction contract to sue on the contract rather than being relegated to his cause of action for quantum meruit.'" *Edifika Invs., LLC v. Chain & Chain Constr., LLC*, No. 04-21-00568-CV, 2023 WL 3487027, at *3 (Tex. App.—San Antonio May 17, 2023, no pet.) (mem. op.) (quoting *Vance v. My Apartment Steak House of San Antonio, Inc.*, 677 S.W.2d 480, 482 (Tex. 1984)). "The doctrine does not, however, permit the contractor to recover the full consideration provided for in the contract." *Vance v. My Apartment Steak House of San Antonio, Inc.*, 677 S.W.2d 480, 482 (Tex. 1984). "By definition, this doctrine recognizes that the contractor has not totally fulfilled his bargain under the contract—he is in breach." *Id.* "Nonetheless, he is allowed to sue on the contract, but his recovery is decreased by the cost of remedying those defects for which he is responsible." *Id.*

19

. . . .

**Answer:** <u>Jennifer Cambas and Lawrence Cambas</u>

**<u>QUESTION NO 6:</u>**

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate the party NOT identified in Question 5 for its damages, if any, that resulted from such failure to comply?

. . . .

**Answer:** <u>$19,393.04</u>

In response to the Cambases' argument on this point, Trinity argues that we should disregard the jury's answer to the substantial performance question because they should not have answered it. "A question is immaterial when it . . . was properly submitted but has been rendered immaterial by other findings." *Se. Pipe Line Co. v. Tichacek*, 997 S.W.2d 166, 172 (Tex. 1999). "[B]ecause immaterial answers cannot support a judgment," the jury's answer to an immaterial question is properly disregarded. *BP Am. Prod. Co. v. Red Deer Res., LLC*, 526 S.W.3d 389, 402 (Tex. 2017). As a result, since the jury should not have answered the question about substantial performance, we disregard their answer.

Moreover, the jury found that Trinity did not materially breach the written contract and that it was entitled to the full payment. That was likely due to Brickley's testimony that the written contract was fully performed as of 8:00 p.m. on July 20, 2021, Stuart's testimony that Trinity had performed the work in a good and workmanlike manner, and testimony showing that

20

the Cambases had written checks totaling $19,393.04 to Trinity for performance of its work under the written contract.[7]

Because we find that the jury was not supposed to answer the substantial performance question and that the $19,393.04 represented the damages sustained by Trinity on the written contract, we overrule the Cambases' second point of error.

## IV. Trinity's Quantum Meruit Recovery on the Oral Agreement Was Not Barred

In their third point of error, the Cambases argue that Trinity was not entitled to recover under a quantum meruit theory because there was an express oral contract.

"Quantum meruit is an equitable remedy which does not arise out of a contract, but is independent of it." *Vortt Expl. Co. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990). "When a valid agreement already addresses the matter, recovery under an equitable theory is generally inconsistent with the express agreement." *Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 50 (Tex. 2008). "As a general rule, a plaintiff who seeks to recover the reasonable value of services rendered or materials supplied

---

[7]Moreover, we reject the Cambases' argument that "the cost of remedying Trinity's incomplete and deficient performance was $23,688." To support that figure, the Cambases rely on the following portion of transcript from Lawrence's testimony:

> Q     [(By the Cambases' counsel)]  How much did you have to pay out of pocket to get the repairs done after Ms. Brickley left the project?
>
> A     18,688.  I don't remember the change, but I believe it's -- I know it was 18,688 and change.
>
> Q     How much out of your own pocket did you pay for material costs?
>
> A     I don't recall the exact number.  Maybe 5,000.

However, the record shows that those payments were made primarily to Dr. Fix-It.  Rosa testified that they redid the kitchen flooring even though nothing was wrong with it because the Cambases "just wanted better quality flooring," and Daniel testified they replaced the living floor a third time because the Cambases wanted better flooring.

21

will be permitted to recover in quantum meruit only when there is no express contract covering those services or materials." *Laredo Jet Ctr., LLC v. City of Laredo*, No. 04-17-00316-CV, 2018 WL 3551255, at *4 (Tex. App.—San Antonio July 25, 2018, pet. denied) (mem. op.) (quoting *Truly v. Austin*, 744 S.W.2d 934, 936 (Tex. 1988)).[8]

While there was an oral agreement, we must analyze its contents to determine whether there was an express oral contract. "The elements of written and oral contracts are the same and must be present for a contract to be binding." *H.L. Zumwalt Constr., Inc. v. Rd. Repair, LLC*, No. 04-20-00134-CV, 2021 WL 4754835, at *5 (Tex. App.—San Antonio Oct. 13, 2021, pet. denied) (mem. op.) (quoting *Critchfield v. Smith*, 151 S.W.3d 225, 233 (Tex. App.—Tyler 2004, pet. denied)). "To establish the existence of a valid contract, a party must show (1) an offer; (2) an acceptance; (3) a meeting of the minds; (4) each party's consent to the terms; (5) execution and delivery of the contract with intent that it be mutual and binding; and (6) consideration." *Id.* "In order to be legally binding, a contract must be sufficiently definite in its terms so that a court can understand what the promisor undertook." *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992). "The material terms of the contract must be agreed upon before a court can enforce the contract. Where an essential term is open for future negotiation, there is no binding contract."[9] *Id.*

---

[8]The Fourth Court of Appeals has found that "there is an exception [to the general rule] for 'building or construction contracts.'" *Laredo Jet Ctr., LLC*, 2018 WL 3551255, at *4 (quoting *Truly*, 744 S.W.2d at 937).

[9]In their reply brief, the Cambases argue that Trinity's petition judicially admitted that there was a valid enforceable contract. Yet, Trinity pled quantum meruit as an alternative to its breach of oral contract claim and "[w]hether an agreement is legally enforceable or binding is a question of law." *Oakrock Expl. Co. v. Killam*, 87 S.W.3d 685, 690 (Tex. App.—San Antonio 2002, pet. denied) (quoting *Am.'s Favorite Chicken Co. v. Samaras*, 929 S.W.2d 617, 622 (Tex. App.—San Antonio 1996, writ denied)).

The record demonstrates that the Cambases periodically asked Trinity to perform work not included in the written contract. The Cambases testified that they orally agreed for Trinity to paint kitchen cabinets, remove popcorn ceilings, upgrade the backsplash, trim trees, and purchase items from Home Depot. However, the record fails to show that there was any meeting of the minds on material terms.

For example, there was no agreement on the amount that would be charged for each item performed or for the total of all the items performed. The oral agreement did not include what quality or type of materials would be used or how much of each material was required, and it contained no term as to the cost of labor. Instead, the evidence shows that the Cambases periodically asked for additional work and that, after completing the work, Trinity submitted a final bill. "[A] contract which does not fix the price or consideration or provide an adequate way in which it can be fixed is too incomplete to be specifically enforceable." *Bendalin v. Delgado*, 406 S.W.2d 897, 899 (Tex. 1966). Also, "[w]here . . . material terms of the contract were not agreed to, but were left for future adjustment, as in this case, enforcement cannot be granted." *Lynx Expl. & Prod. Co. v. 4-Sight Operating Co.*, 891 S.W.2d 785, 789 (Tex. App.—Texarkana 1995, writ denied). Accordingly, because there was no express contract, we reject the Cambases' argument that Trinity's quantum meruit claim was barred.

Next, for Trinity to recover under a quantum meruit theory for the oral agreement, it had to prove the following:

1)       valuable services were rendered or materials furnished;

2)       for the person sought to be charged;

23

3) which services and materials were accepted by the person sought to be charged, used and enjoyed by him;

4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff in performing such services was expecting to be paid by the person sought to be charged.

*Vortt Expl. Co.*, 787 S.W.2d at 944 (quoting *Bashara v. Baptist Mem'l Hosp. Sys.*, 685 S.W.2d 307, 310 (Tex. 1985)). The Cambases do not dispute that Trinity rendered valuable materials and services for them under the expectation of being paid. Instead, looking to the third factor, they argue that they never accepted Trinity's substandard performance.

The Cambases' do not specifically challenge in their brief the evidence supporting the jury's verdict. To the extent that their brief can be fairly read to include a legal sufficiency challenge, we overrule it. Brickley testified that she completed each repair requested under the oral agreement, and Lawrence agreed. Although he testified that the backsplash was missing tiles, the jury saw before and after photos of the renovation and could determine that no tiles were missing from the backsplash. While Lawrence complained that the countertops were "sticker laminate," the jury saw text messages to Brickley from the Cambases saying that the Cambases were over budget on the laminate and backsplash and they "need[ed] to look at the cheap laminate stuff" that was installed. The Cambases complained about the paint, but when Brickley sent photos of the painted cabinets, Jennifer texted, "Wow! Is this the same house?" From this evidence, viewed in the light most favorable to the verdict, the jury was free to find that the Cambases accepted Trinity's work under the oral agreement.

In sum, we find that Trinity was entitled to quantum meruit recovery for the oral agreement. We overrule the Cambases' third point of error.

24

## V.    Trinity Was Entitled to Attorney Fees

Under Section 38.001 of the Texas Civil Practice and Remedies Code, Trinity was entitled to recover attorney fees for its breach of contract claim and its claims for rendered services, performed labor, and furnished material. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(b) (Supp.). The Cambases' only argument on the issue of attorney fees assumes reversal of the trial court's judgment on appeal. They argue only that, "[b]ecause this Court must reverse the trial court's . . . Judgment and render an order holding that the Cambas Parties are not liable to Trinity for either breach of contract or quantum meruit, it must likewise reverse the trial court's award of attorney's fees." Because we have overruled the Cambases' other points of error, we likewise overrule their complaint about attorney fees.

## VI.    Conclusion

We affirm the trial court's judgment.

Charles van Cleef
Justice

Date Submitted:        April 15, 2025
Date Decided:          May 15, 2025

25